MARGARET FLYNN *vs.* PAUL BUTLER & another.

Middlesex.    March 20, 21, 1905. — October 23, 1905.

Present: KNOWLTON, C. J., MORTON, LATHROP, HAMMOND, & BRALEY, JJ.

*Explosives.    Nuisance.    Assignment.    Release.    Agency.*

R. L. c. 102, § 93, imposing a fine for keeping gunpowder without complying with certain requirements, gives no civil remedy for an injury from an explosion of gunpowder kept contrary to its provisions.

R. L. c. 102, § 103, giving a civil remedy for injuries from explosions of explosives kept or transported contrary to the provisions of that chapter, gives no remedy for an injury from an explosion of gunpowder, which by § 105 of the same chapter is excepted from the substances covered by the word "explosive" or "explosives."

In an action for an injury from an explosion of gunpowder caused by the blowing up of a magazine of the defendant alleged to have been a nuisance at common law, the plaintiff may introduce evidence to show the proximity of buildings and highways and the density of the population near the magazine.

A magazine for the storage of gunpowder and dynamite in a populous neighborhood may be found to be a nuisance at common law, especially if a portion of its floor is saturated with nitroglycerine, and if a direct injury results to an individual from the nuisance he may maintain an action for damages, which may be followed in the discretion of the court by an abatement of the nuisance.

It is no defence to an action against the proprietor of a magazine for the storage of gunpowder and dynamite, for injuries caused by an explosion of the magazine, that the defendant allowed the tenant of an adjoining compartment of the building to repair the magazine and for this purpose to remove its contents temporarily.   Nor is it a defence that the simultaneous exploding of the magazine of another rendered the explosion more destructive.

A claim for personal injuries is not assignable before judgment.

A woman, having a claim for personal injuries from certain explosions and also a claim against the same persons for destruction of property by the same explosions, upon being paid for the property destroyed, executed and delivered to the attorney of the persons liable an assignment of all claims for destruction of property "and also all other claims and demands . . . by reason of damage of any name or nature arising out of said explosions," and appointed the person to whom the instrument was delivered her attorney to collect, release, receipt for and settle all such claims and demands.   Afterwards she brought an action for the personal injuries caused by the explosions, and the defendants set up this instrument as a release of liability.   *Held,* that the instrument could not operate as an assignment of the claim for personal injuries, which was not assignable, nor as a release to the defendants who were not parties to it, especially as it purported to assign an existing cause of action and not to extinguish it, and that whatever authority to release the claim the instrument gave as a power of attorney was revoked by the bringing of the action.

TORT for personal injuries.   Writ dated May 21, 1904.

At the trial in the Superior Court before *Wait*, J. it appeared that the plaintiff was injured at about nine o'clock on the morning of July 29, 1903, by the explosion of certain gunpowder and dynamite then upon a piece of land about an acre in extent in that part of Tewksbury known as Riverside Park, which was owned one undivided half by the defendants, Paul Butler and Blanche Butler Ames, and the other undivided half by the heirs of one Nichols and one Fletcher.   There were two magazines or powder houses upon this piece of land.   One of them, called " Magazine Number One," was built in 1876 and was owned, two thirds by the defendants as copartners under the firm name of the United States Cartridge Company, and one third by the heirs of Nichols and Fletcher.

The other magazine, called " Magazine Number Two," was built in the year 1885, and had been owned by the defendants as copartners since 1893.   On the day of the explosion it was occupied by E. I. Dupont DeNemours and Company, a Delaware corporation, to which it had been leased in 1896 by the defendants, as a magazine for the storage of gunpowder.   At the date of the explosion the Dupont company had stored there about one thousand pounds of black gunpowder.

Robert Catherwood, who was a selectman of Tewksbury at the date of the explosion, testified from a census which he made directly thereafter, that at the date of the explosion there were between four hundred and five hundred people living within a radius of half a mile of these magazines, and ninety-six dwelling houses located within the same radius.

 , Paul Butler, one of the defendants, was called by the plaintiff, and testified that he was familiar with the topography of the neighborhood of the magazines as it was at the date of the explosion.   The plaintiff asked him whether there was not an electric car line near the magazines.   The defendant objected to this question.   The judge excluded the question, and the plaintiff excepted.

The plaintiff introduced a map of the territory within half a mile of the magazines as it was at the date of the explosion, and sought to introduce through Messrs. Catherwood and Butler evidence as to the precise location and distance from the maga-

zines of the various dwelling houses, but the defendants objected and the judge excluded, as immaterial, all evidence of the location and distance from the magazines of any house but the plaintiff's; to which ruling the plaintiff excepted.

Paul Butler testified that he had never, before the date of the explosion, delivered to any of the firewards of the town of Tewksbury any statement in writing of the amount of gunpowder kept or proposed to be kept by the United States Cartridge Company in either of the magazines, and that neither the defendant Blanche Butler Ames, nor any person in her or their behalf, had ever done so to his knowledge.

It appeared that no ordinances, by-laws or regulations ever had been passed by the town of Tewksbury relative to the storage of gunpowder and explosives, and that the town had no fire department, or chief engineer.

The five firewards of the town of Tewksbury at the date of the explosion testified that they all were elected and qualified as firewards in March, 1903, and continued to be and act as all of the firewards of that town from that date to July 29, 1903. Each testified that he had never before the date of the explosion received from the defendants or either of them, or from anybody in their behalf, any statement in writing of the amount of gunpowder kept or proposed to be kept by them in either of the magazines. It appeared that before March, 1903, the town never elected firewards.

Paul Butler testified that about three weeks before the explosion his attention was called to the fact that some stains resembling grease spots had been found on the floor of Magazine Number One; that these spots extended from the compartment of the American Powder Mills underneath the partition between the compartments into the floor of the compartment owned by the defendants, and he thought it was caused by nitroglycerine which had leaked from the dynamite belonging to the American Powder Mills, and saturated the floor; that he immediately ordered Clarence E. Hoxie, the superintendent of the United States Cartridge Company, to notify the occupants of the other compartment of the leakage and to notify them to have the difficulty remedied; that he further directed Hoxie to see that the cartridge company had nothing to do with the work and

assumed no responsibility for it, as they knew nothing about dynamite and did not use it.

Hoxie testified that on July 28, 1903, Moses G. Garfield, superintendent of the American Powder Mills, called at the office of the cartridge company and talked the matter over with him; that Garfield said they had decided that the spot was the result of leakage of nitroglycerine from their dynamite, and that they wanted to take the floor up, and would do all the work at their expense and assume all the responsibility; that he should like to hire some of the men employed by the cartridge company to do the work under his direction; that he (Hoxie) agreed that some of these men might work for Garfield in this matter if they were willing to do so, but that they must do so, if at all, as employees of the American Powder Mills, and under their direction and pay, as the cartridge company would have nothing to do with the work; that the men who were sent from the cartridge company to the magazine on the day of the explosion all were sent on this understanding as employees of the American Powder Mills for this work; that Clarendon Goodwin, a master mechanic and carpenter in the general employ of the defendants, and without experience in handling explosives, by arrangement with Garfield, went in charge of these men; that Garfield further agreed to remove all powder of the cartridge company from their compartment of the magazine to such distance as he saw fit before doing any work upon the floor; that for this purpose the powder should be loaded on teams and the teams driven to such distance from the magazines.

It appeared that before nine o'clock on the morning of July 29, 1903, the powder of the defendants was removed from Magazine Number One by these men under the direction of Goodwin, and loaded by them upon three trucks; that at the time of the explosion these trucks, loaded with the powder, stood on the plot of ground owned as tenants in common by the defendants and the heirs of Nichols and Fletcher, and between the two magazines, between two and three hundred feet away from the magazine occupied by the defendants.

Alameda J. Belanger testified that he was one of the men detailed from the loading room of the United States Cartridge

Company to remove the powder from their compartment of Magazine Number One on the morning of the explosion; that he assisted in removing the powder to the trucks; that after all the powder belonging to the defendants had been removed and while it was standing on the trucks on the magazine lot, but before any of the dynamite belonging to the American Powder Mills had been taken out of the magazine, Goodwin entered the defendants' compartment of the magazine with a jug and a broom in his hand; that he poured some liquid on the spot on the floor and then scrubbed the spot vigorously with the broom for about ten seconds; that smoke then began to issue from the spot; that Goodwin shouted for water; that the other men brought water and threw it upon the spot, which continued to smoke; that the smoke filled the magazine and was issuing through the outside door when the explosion occurred at about nine o'clock A. M.

It appeared that the explosion of the dynamite and powder in the magazine of the American Powder Mills caused the powder on the trucks and in the Dupont magazine to explode almost simultaneously.

The plaintiff, who was a woman about sixty years of age, testified that she owned a dwelling house within six hundred yards of the magazines, upon which at the time of the explosion there was a mortgage for $1,800 held by one Burtt; that she was working in the kitchen of this house when the explosion occurred; that she was hit upon the head by a falling door, knocked down and thrown against the kitchen stove; that mortar and laths fell upon her from the ceiling, and the house was badly shattered.

Dr. William P. Lawler testified that he was the plaintiff's physician; that he had known her before and after the explosion, and had paid her many visits since the time of the explosion; that he had observed since the explosion many peculiarities of manner, speech and conduct upon her part; that there were times when she was not quite bright; and that in his opinion, based upon what he had observed personally, her mental faculties were somewhat impaired.

Dr. James B. O'Connor testified that he knew the plaintiff before the explosion and had seen her many times since that

time and had observed peculiarities in manner, speech and conduct on her part.

Dr. Philip C. Knapp, an expert on mental and nervous disorders and diseases of the brain, testified that he had made a personal examination of the plaintiff a few days before the trial. Basing his opinion upon this examination and upon the assumption that she had done all the things to which the witnesses for the plaintiff had testified, he stated that in his opinion the plaintiff's mental faculties were impaired and that she was incapable of appreciating or understanding a business contract.

It appeared that on a certain day in January, 1904, the plaintiff, her son Stephen Flynn, and Burtt, the mortgagee mentioned above, met at the office of Burke and Corbett, who then were acting as attorneys for the defendants; that at that interview Mr. Burke, one of the firm of Burke and Corbett, handed the plaintiff their check for $450 payable to her order, and to Stephen Flynn their check for $250 payable to his order, and that the plaintiff, who could neither read nor write, signed by her mark at that time the paper marked "Exhibit 1," which had been prepared by Burke and Corbett. Stephen Flynn testified that the check for $250 was to cover damages occasioned by the explosion to certain household furniture which he owned and which was in the plaintiff's house at the date of the explosion; that Mr. Burke said the check for $450 was to liquidate damages to property; that nothing was said by anybody concerning any claim which the plaintiff might have for personal injuries caused by the explosion.

The plaintiff testified that the $450 was for repairs to the house. The plaintiff was asked by her counsel, "Did you understand, Mrs. Flynn, that this release was for anything except a release of your claim for damages to your house?" The defendants objected, the judge excluded the question, and the plaintiff excepted.

It appeared that at the interview and before leaving the office of Burke and Corbett, the plaintiff, by her mark, indorsed her name on the back of the check for $450 and delivered it to Burtt; that Burtt cashed the check and credited it on the mortgage, and that the plaintiff personally never received any part of the money.

The defendants introduced the evidence of James F. Corbett, whose name appears in "Exhibit 1." He testified that the money which was paid by Burke and Corbett to the plaintiff was received in part from the defendants, and was so received from them in satisfaction or compromise of all claims of the plaintiff growing out of the explosion.

### "Exhibit 1.

" Know all men by these presents that we Mary Flynn, Stephen Flynn and Agnes Flynn all of Lowell in the County of Middlesex and Commonwealth of Massachusetts, in consideration of one dollar and other considerations to us paid by James F. Corbett of Lowell in said County, the receipt whereof is hereby acknowledged, do hereby assign, transfer, and set over unto the said James F. Corbett and his executors, administrators or assigns, all claims and demands which we have against the American Powder Mills, or against Paul Butler and Blanche Butler Ames, copartners under the firm name of the United States Cartridge Company, or against the E. I. Dupont de Nemours & Co., or against any or all of them, or against any other person or corporation whatever for injury and damage to any property of ours, real or personal, and more particularly to our furniture and other personal property and buildings situated at No. 46 Billerica Street in Tewksbury occasioned by reason of an explosion or explosions which occurred in or near magazines owned or occupied by said American Powder Mills, United States Cartridge Company, and the E. I. Dupont de Nemours & Co., on the twenty-ninth day of July 1903, and also all other claims and demands which we may have by reason of damage of any name or nature arising out of said explosions.

" And we hereby appoint the said James F. Corbett our true and lawful attorney irrevocable, with full power and authority to collect, demand, receive, release, receipt for, settle or compromise any or all of said claims and demands, from, to, or with either or all of the parties against whom we hold the same, upon such terms and conditions and in such manner and with such covenants and agreements as he shall see fit, in our name but for the sole use and benefit of himself and his executors,

administrators or assigns; and to begin and prosecute such suits at law or equity as he shall see fit, whether in our name or otherwise, for the enforcement of such claims and demands against any or all of the parties aforesaid as well as to take charge of and manage, prosecute, or discontinue any suits now pending in relation thereto, and generally to act in all things in relation to the premises in any manner which we might personally act, with full power of substitution of any other person or corporation as our attorney in his place, provided however that he save us harmless from all expense that we might otherwise be liable for by reason of his doings in the premises.

" In witness whereof we have hereto set our hands and seals this 28th day of January 1904.

Her<br>
" Mary × Flynn     (Seal)<br>
Mark.<br>
Stephen Flynn     (Seal)<br>
Agnes Flynn     (Seal)

" Witness William L. Harris (to all) "

Soon after the trial began the plaintiff discontinued as to the American Powder Mills, and the action proceeded against Paul Butler and Blanche Butler Ames as the only defendants.

At the close of the evidence, upon motion of the defendants, the judge ruled that upon all the evidence the plaintiff was not entitled to recover and ordered a verdict for the defendants. The plaintiff alleged exceptions. During the argument of the motion on which the verdict for the defendants was ordered nothing was said with reference to any invalidity of the paper marked " Exhibit 1 " by reason of mental incapacity of the plaintiff to execute it.

*A. S. Howard,* for the plaintiff.

*G. L. Mayberry & F. L. Washburn,* for the defendants.

BRALEY, J. This is an action of tort for personal injuries caused by the explosion of gunpowder and other explosives, under the same general conditions which appear in the case of *Oulighan* v. *Butler, ante,* 287.

By an amendment, the third count of the declaration was abandoned, and the trial proceeded upon the remaining counts. The first of these alleged that the defendants' gunpowder was

stored in violation of the R. L. c. 102, § 93, while by the second the plaintiff sought to hold them liable for the maintenance of a nuisance.

The land upon which the powder house stood, was situated in the town of Tewksbury, which maintained no fire department. Neither had it adopted any by-laws regulating the manner in which this, or other explosives, should be stored or kept for sale. No notice ever had been given to the firewards of the town, as required by the statute, of the amount of gunpowder which the defendants proposed to keep, with a description of the building in which it was to be stored, though they had used the premises for this purpose from 1893 to the date of the explosion.

But if, without giving such notice, the storage of the gunpowder was made a penal offence, no civil remedy to recover damages is given by this section to those injured by its explosion. Such a remedy is provided by § 103, where the injury follows from the keeping of explosives, or their transportation, in violation of the general provisions of this chapter. Gunpowder, however, being expressly excepted by § 105, the plaintiff, upon the evidence, is left without any statutory cause of action, and is obliged to rely upon the second count. R. L. c. 102, §§ 93, 103, 105.

In *Commonwealth* v. *Kidder*, 107 Mass. 188, 192, it was said: " A nuisance at common law may consist in the keeping or manufacture of gunpowder, naphtha, or other explosive or inflammable substances in such quantities and places or in such a manner as to be dangerous to the persons and property of the inhabitants of the neighborhood."

In a community sparsely settled, a magazine of the capacity of that belonging to the defendants, when filled with the quantity of gunpowder shown by the evidence, may not imperil life or property in the vicinity by reason of a possible explosion; but if located in a more populous neighborhood it might be found to endanger both.

In such an inquiry, the proximity of dwellings, or of highways, or of the usual facilities for public travel, or the density of population, may be shown, and the exclusion of the evidence offered by the plaintiff for this purpose was erroneous.

Under suitable instructions, the jury could have found, that by reason of its location, the magazine as ordinarily used, or after its use had become extremely hazardous by reason of the presence of nitroglycerine, with which a portion of the floor had become saturated, was within that class of dangerous objects that, according to common experience, are likely to cause damage, or are considered so intrinsically harmful as to expose the persons or property of others to the chance of instantaneous injury or destruction. Cooley on Torts, (2d ed.) § 607. See Pollock on Torts, (7th ed.) 400, 404, 489, 490.

If this condition was established, then the maintenance of a building so used became a constant menace to the safety of the immediate community, and hence constituted a nuisance. *Commonwealth* v. *Kidder*, 107 Mass. 188. *People* v. *Sands*, 1 Johns. 78. *Cheatham* v. *Shearon*, 1 Swan, (Tenn.) 213. *Regina* v. *Lister*, Dearsly & Bell, 209. *Myers* v. *Malcolm*, 6 Hill, 292. *Wilson* v. *Phœnix Powder Manuf. Co.* 40 W. Va. 413. *McAndrews* v. *Collerd*, 13 Vroom, 189. *Laflin & Rand Powder Co.* v. *Tearney*, 131 Ill. 322. *Bradford Glycerine Co.* v. *St. Mary's Woolen Manuf. Co.* 60 Ohio St. 560. *Heeg* v. *Licht*, 80 N. Y. 579. *Emory* v. *Hazard Powder Co.* 22 S. C. 476. *Comminge* v. *Stevenson*, 76 Tex. 642. *Rudder* v. *Koopman*, 116 Ala. 332. *Wier's appeal*, 74 Penn. St. 230. Compare *Dilworth's appeal*, 91 Penn. St. 247 ; *Kinney* v. *Koopman*, 116 Ala. 310 ; *Dumesnil* v. *Dupont*, 18 B. Mon. 800 ; *Judson* v. *Giant Powder Co.* 107 Cal. 549 ; *Kleebauer* v. *Western Fuse & Explosives Co.* 138 Cal. 497.

Where the general public only are annoyed, the remedy would be by indictment. *Commonwealth* v. *Rumford Chemical Works*, 16 Gray, 231. *Commonwealth* v. *Parks*, 155 Mass. 531, 533. *Commonwealth* v. *Packard*, 185 Mass. 64. But when direct injury to an individual results, a private action can be sustained for damages suffered, to be followed, in the discretion of the court, by judgment for an abatement. *Codman* v. *Evans*, 7 Allen, 431; *Wesson* v. *Washburn Iron Co.* 13 Allen, 95. *Quinn* v. *Lowell Electric Light Corp.* 140 Mass. 106. R. L. c. 186. A bill in equity also may be maintained for an injunction to restrain its further continuance. *Davis* v. *Sawyer*, 133 Mass. 289.

In this continued use of their land, at the risk of inflicting injurious consequences upon others, the defendants were under

a legal obligation to take every possible precaution absolutely to prevent injury therefrom to those living in the neighborhood. *Gray* v. *Boston Gas Light Co.* 114 Mass. 149. *Ainsworth* v. *Lakin,* 180 Mass. 397. See *Davis* v. *Rich,* 180 Mass. 235, 237; *Rockport* v. *Rockport Granite Co.* 177 Mass. 246, 255. The only exceptions are a possible explosion precipitated by a great and unanticipated natural force, or the wrongful acts of persons over whom they had no control, and that reasonably could not be anticipated. *Salisbury* v. *Herchenroder,* 106 Mass. 458. *Gorham* v. *Gross,* 125 Mass. 232, 238.

The defendants endeavor to avoid this liability, because there was evidence from which it might have been found that the explosion would not have occurred if the American Powder Mills, which was making the repairs, and over whose magazine they had no supervision, had not been negligent.

No contract was entered into by which the mills engaged independently to repair the floor of the defendants' magazine. If there had been such a contract they would not have been exonerated. *Hilliard* v. *Richardson,* 3 Gray, 349, 366. At most the arrangement amounted to a revocable license to go upon the premises and handle their gunpowder, for the purpose of removing from each compartment a source of danger common to both, but permitted to exist by the mills, that, as between themselves, alone was responsible.

The boxes of powder, although on the wagons, still remained the property of the defendants, and subject to their control. Even if done by order of a servant of the mills, the jury might find that the temporary shifting of this explosive from one part of the lot to another, which, as tenants in common, the defendants, or their licensee, rightfully could use for this purpose, did not render its keeping less noxious. Nor was there in any sense an abandonment by them of the premises as a permanent place for its unlawful storage.

Besides, they were fully informed of the cause that had made necessary the removal of a portion of the floor of the several compartments, as this work had been undertaken at their urgent request. They knew of the dangerous character of the work required, and also that during these repairs, their own gunpowder would have to be removed to a place of safety. This

contemplated use of their premises manifestly would be attended with great danger by reason of the highly combustible quality of the nitroglycerine.

In the natural course of things, if suitable precaution was not taken, this substance, upon friction, was likely to ignite, and the heat thus generated probably would set fire to the several explosives. It was equally plain that if their gunpowder exploded in bulk injury to their neighbors might follow.

With this understanding of the attendant risks, they were not relieved from responsibility simply because they permitted the tenant of the adjoining compartment, for their mutual benefit, to repair the magazine, and for this purpose to remove its contents temporarily. *Gray* v. *Harris*, 107 Mass. 492. *Lane* v. *Atlantic Works*, 111 Mass. 136. *Derry* v. *Flitner*, 118 Mass. 131, 134. *McCauley* v. *Norcross*, 155 Mass. 584, 586. *Wetherbee* v. *Partridge*, 175 Mass. 185. *Shipley* v. *Fifty Associates*, 106 Mass. 194, 200. *Koplan* v. *Boston Gas Light Co.* 177 Mass. 15, 27. *Turner* v. *Page*, 186 Mass. 600.

Whether placed in the magazine, or on wagons, the primary duty still rested on the defendants so to handle their gunpowder as not to jeopardize persons or property in the vicinity. *Bower* v. *Peate*, 1 Q. B. D. 321. *Pickard* v. *Smith*, 10 C. B. (N. S.) 470. *Stewart* v. *Putnam*, 127 Mass. 403. *Woodman* v. *Metropolitan Railroad*, 149 Mass. 335, 340. *Ainsworth* v. *Lakin*, 180 Mass. 397. Compare *Patnoude* v. *New York, New Haven, & Hartford Railroad*, 180 Mass. 119, 120.

The explosion undoubtedly was rendered more destructive by the simultaneous exploding of the different magazines, yet the plaintiff was entitled to maintain her action against each or all who contributed to her injury. *Boston & Albany Railroad* v. *Shanly*, 107 Mass. 568, 579. *Oulighan* v. *Butler, ante*, 287.

She further seeks to hold the defendants liable for the discharge of the contents of the second building owned by them, but leased and occupied at the time by their tenant, for the storage of gunpowder. It is enough to say that this claim cannot be sustained, as the declaration contains no sufficient allegations setting forth such a cause of action.

There remains for consideration the effect of an instrument alleged to have been executed by the plaintiff, under which the

defendants contend that by the general clause "all other claims and demands which we may have by reason of damage of any name or nature arising out of said explosions", she released them from any liability for damages covered by the present action.

It was a serious question of fact whether this instrument was executed under such circumstances as to make it legally binding upon her, and if it is found to have the inclusive effect for which the defendants contend, this issue should have been submitted to the jury. *O'Donnell* v. *Clinton,* 145 Mass. 461.

When considered as an attempt to assign a claim for her personal injuries, no title passed to the assignee, as such a claim was unassignable before judgment. *Rice* v. *Stone,* 1 Allen, 566. *Stone* v. *Boston & Maine Railroad,* 7 Gray, 539. *Linton* v. *Hurley,* 104 Mass. 353. *Bennett* v. *Sweet,* 171 Mass. 600. *Robinson* v. *Wiley,* 188 Mass. 533.

But if, while expressed in the form of an assignment, it was the intention of the parties that the instrument should operate as a technical release, the defendants are not parties ; neither are there any recitals that it was made for their benefit. No appropriate words are found which give it this effect, and being unambiguous, parol evidence was inadmissible to explain or vary its terms. *Hammond* v. *Pinkham,* 149 Mass. 356, 359. Furthermore, the claim was not extinguished, but on the contrary is expressly assigned as an existing cause of action.

The defendants further contend that the writing may be given effect as a power of attorney, authorizing the agent to release the demand. Even then, so long as the power remained unexecuted, it was revocable at the pleasure of the plaintiff. The agency conferred was in conjunction with the subject matter of the assignment, the consideration of which so far as it relates to the wrong to her person had fully failed. Upon this part of the instrument becoming inoperative, the accompanying power became a mere naked authority, uncoupled with any vested interest of the agent, or without conferring upon him any valuable independent rights as a consideration.

By the defendants' amended answer, pleading the assignment as a release, or by the evidence, it nowhere appears that any further relinquishment of her claim was attempted. It accord-

ingly may be assumed that after delivery and payment of the money, no steps were taken to exercise the power, or to effect an adjustment before the bringing of this action.

In commencing the .action, and proceeding to trial, the plaintiff could be found to have manifested her intention to withdraw any authority she previously may have delegated. Thereupon it would be terminated by an implied revocation, of which the attorney, upon the evidence, must be presumed to have had knowledge. The plaintiff, consequently, is not barred from prosecuting her action.

We are of opinion, for the reasons stated, that the case should have been submitted to the jury, and that the ruling directing a verdict for the defendants was wrong.

*Exceptions sustained.*