# FRANK JOSEPH GODSOL

*vs.*

# THE NASH MOTORS COMPANY.

*Contract With Sales Agent—Sole Right for Foreign Territory—*
*Sales to Government.*

A contract by an automobile manufacturing corporation, giving the "sole right" to sell its product "in" and "to" certain European countries named, and "to or for the governments of" these countries "for use by them without the said territory," did not apply to sales made to the United States government for army purposes, although the automobiles and "spare parts" so sold were afterwards shipped to one of such countries and there used in army operations.                    p. 404

Nor did a subsequent provision of the contract, that it should apply to all sales "in or for" such territory, render it applicable to such sales to the United States government, such phrase not meaning "in or for use in" such territory.    p. 405

Nor did a reference in the contract to the prices at which trucks and other products should be sold "to a country engaged in war" extend plaintiff's exclusive right to any country engaged in war, in view of the fact that previous paragraphs expressly limited it to the countries therein named.

pp. 405, 406

That, during the war, two hundred of the trucks sold to the United States government were turned over to the army of one of these European countries, did not entitle the plaintiff to commissions on the prices of such trucks, they not being sold by the manufacturer, directly or indirectly, to the government of that country, and not being sold for resale in that country or to that government.                    p. 407

*Decided November 16th, 1921.*

Appeal from the Baltimore City Court (SOPER, C. J.).

Action by Frank Joseph Godsol against the Nash Motors Company. From a judgment for defendant, plaintiff appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS. and OFFUTT, JJ.

*Joseph W. Bailey, Charles H. Tuttle,* and *Howard Bryant,* for the appellant.

*Thomas M. Kearney, Edwin G. Baetjer,* and *Charles Mc-Henry Howard,* with whom were *Venable, Baetjer & Howard* on the brief, for the appellee.

THOMAS, J., delivered the opinion of the Court.

This suit was brought in the Baltimore City Court by the appellant, now known as Frank Joseph Godsol, against the Nash Motors Company, to recover commissions to the amount of $5,590,970, alleged to be due him on sales of motor trucks and "spare parts" sold by the defendant company to the Government of the United States.

In August, 1915, the appellant entered into the following contract with The Thomas B. Jeffery Company, a corporation of the State of Wisconsin:

"This Agreement, Made and entered into on the day of its date between The Thomas B. Jeffery Company, a corporation of the State of Wisconsin, United States of America, hereinafter named 'the Manufacturer,' and F. J. Goldsoll, of the City of Paris, France, hereinafter named 'the Dealer,' witnesseth that:

"1. The manufacturer agrees that the dealer shall, during the term and life of this contract, have the sole right to sell the motor cars, tractors, trucks and all other products of the manufacturer in the following territory,—that is to say, in the countries of France, Servia and Belgium on the Continent of Europe.

"2. The sole right hereby granted by the manufacturer to the dealer shall be deemed to include, and shall include, the right on the part of the dealer to sell said motor cars, tractors, trucks, and other

products of the countries named and to any and all of them, and also to or for the governments of the countries named for use by them without the said territory.

"3.    This is not a contract for the sale of cars, and no contracts or orders for the sale of motor cars and trucks made by the dealer hereunder shall be binding on the manufacturer for any purpose until such orders are accepted by it or its duly authorized representative at the office of the manufacturer at Kenosha, Wisconsin.

"4.    The prices at which sales of motor cars, tractors, trucks and other products made hereunder shall, unless otherwise mutually agreed, be the regular list prices for such cars, trucks, etc., as such list prices are fixed and established by the manufacturer from time to time, and such as are in force in the territory described at the time any given sale is made. Provided, however, that by mutual agreement between the parties hereto the price at which sales are made of cars, trucks, tractors or other products hereunder to a country engaged in war may be varied and fixed at such amounts as the circumstances of each particular case warrant, and that whenever special equipment is required by any nation engaged in war, or by any other purchaser, such variation shall be made to the regular list price of the manufacturer for the cars, trucks, tractors, or other products to which such equipment is applied as, to the parties hereto, may seem reasonable under all of the circumstances of the transaction.

"5.    The manufacturer shall collect and receive from each purchaser the entire purchase price of all cars and trucks sold and delivered in the territory described during the life of this contract, and the compensation of the dealer for all work, labor and services rendered, and for all expenses incurred by him in connection with the sale of motor cars, tractors, trucks, etc., hereunder shall be twenty per cen-

tum (20%) of the list price of the chassis of each motor car, tractor and truck, together with all excess over the price made by the manufacturer to the dealer on all bodies, and all excess over list prices of chassis, and twenty per centum (20%) of list prices of all parts or other property sold by the manufacturer in or for the territory, and the dealer agrees to receive the aforesaid said sums as full compensation for all claims and demands of every name and nature growing out of the sale of motor cars, tractors, trucks, and other property hereunder.

"6. Upon the collection by the manufacturer from any purchaser of motor cars, tractors, trucks, or other products, sold in or for said territory during the term hereof, of the selling price or any instalment thereof, said manufacturer agrees to immediately account to the dealer for the portion thereof due to him hereunder, and to pay the same over to him or as he may direct. If such moneys or any part thereof are remitted to the dealer outside of the United States of America, such remittances shall be made at his expense and risk.

"7. The dealer agrees to use his best efforts during the term of this contract in making sales of the motor cars, tractors, trucks and other products of the manufacturer in the territory described, which agreement on his part is declared to be of the essence of this contract; and in case that he uses the name 'Jeffery' in connection with any sales of motor cars or trucks hereunder, to discontinue the use of such name at the time of the termination hereof, and thereafter to refrain from its use in connection with the sale of motor trucks or motor cars or parts therefor. It is understood and agreed that during the term hereof and within the said territory, the dealer may sell and deal in motor cars, tractors, trucks, etc., produced by other manufacturers.

"8. The manufacturer agrees to exercise reasonable diligence in the manufacture and delivery of

motor cars and trucks sold by the dealer hereunder, but does not bind itself to make deliveries of said cars or trucks at any fixed time, or in any fixed amount, or otherwise than as may be particularly specified in each sales agreement.

"9.   The term of this contract in so far as it relates to the country of France shall be during the continuance of the war in which the said country is now engaged and for two years following its close.; and for the countries of Belgium and Servia the term of this contract shall be during the time of the continuance of the said war and until peace is declared.

"10.   It is the intent and purpose of the parties hereto that the terms of this agreement shall apply to cover and include all sales of motor cars, tractors, motor trucks, and other products of the manufacturer covered hereby in or for the territory herein described for the full term hereof, whether such sales are made directly or indirectly by or through said dealer, directly or indirectly by the manufacturer; and also in case deliveries are made after the termination hereof upon contracts or orders received and accepted by the manufacturer before the time of such termination.

"11.   This contract shall discharge and set at naught all former contracts and understandings made between the parties hereto, and its execution by each is accepted by the other as full settlement, satisfaction and discharge by each of the other of all claims and demands of every name and nature up to this date.

"12.   The manufacturer agrees not to sell any of the products covered hereby to parties other than the dealer for resale in or for the territory aforesaid, and to this end will include in all other contracts that it makes during the term of this agreement for the sale and delivery of its products outside of the United States of America the ultimate destination of the products contracted for, and furthermore will

stipulate that the contractants shall not directly or indirectly resell the product in or for the territory herein mentioned, but it does not bind itself in any way to answer in damages to the dealer unless it breaches the specific conditions of this paragraph. It will, however, upon demand, assign and set over to the dealer any claim that the manufacturer may have against any contractant who breaches the condition of any contract that he shall not sell the products of the manufacturer in the territory covered by this agreement.

"Nothing herein contained shall be deemed to constitute the dealer as the agent of the manufacturer for any purpose; and the manufacturer shall not be bound in respect of any act or representation of the dealer otherwise than in relation to the performance of specific sales contract accepted by the manufacturer or its representative as hereinbefore set forth.

"The failure of either party to keep and perform this contract according to its spirit, purpose and real intent shall give to the other party the right to terminate the same upon ninety (90) days' notice in writing.

"In witness whereof the parties hereunto have herein set their names this third day of August, in the year 1915.

"(Signed)

"The Thomas B. Jeffery Company (Mfr.),

"By Charles Jeffery,

"President.

"F. J. Goldsoll."

The contract of August 3rd was amended by two supplemental agreements between the appellant and the Jeffery Company, one dated October 12th, 1915, and the other dated September 7th, 1916, increasing the commissions to be paid the appellant and providing "that the term of said contract

in so far as it relates to the Republic of France" should "expire with the close of the present European War."

In June, 1916, Congress passed the Act of June 3rd, 1916, known as the National Defense Act (U. S. Statutes at Large, vol. 39, ch. 134), section 120 of which empowered the President, "in time of war or when war is imminent," through any department of the Government, in addition to the existing methods of purchase or procurement, to place an order with any firm, company, corporation, or organized manufacturing industry for such product or material that may be required of the kind usually produced or capable of being produced by such company. Compliance with such orders, which were given precedence over all other orders or contracts previously placed with such company, was made obligatory, and in case such company refused to comply with such orders, or to give the United States preference in the execution thereof, or to furnish the supplies ordered at a reasonable price, as determined by the Secretary of War, the President, through any department of the Government, was authorized to take immediate possession of the plant. Section 120 also provided that any company, or corporation, or the responsible heads of such industry, who refused to comply with its provisions, should be deemed guilty of a felony, and be subject to fine and imprisonment, and that the compensation to be paid for such products or materials or as rental for the use of any manufacturing plant should be fair and just.

In August, 1916, the appellee, the Nash Motors Company, took over the business of the Thomas B. Jeffery Company and assumed all of the obligations of the latter company. After the United States entered into the war, the Government, through the War Department, purchased from the appellee in all 10,164 motor trucks. The orders or contracts for these trucks were dated July 27th, 1917, December 7th, 1917, April 13th, 1918, July 12th, 1918, and July 14th, 1918, and each contract called for delivery of the specified number of trucks at Kenosha, Wisconsin, and for the payment of the

specified price as the just and fair compensation therefor, and also contained the following covenant:

> "Covenant Against Contingent Fees.—The contractor expressly warrants that it has employed no third person to solicit or obtain this contract in its behalf, or to cause or procure the same to be obtained upon compensation in any way contingent, in whole or in part, upon such procurement and that it has not paid, or promised or agreed to pay, to any third person, in consideration of such procurement, or in compensation for services in connection therewith, any brokerage, commission, or percentage upon the amount receivable by it hereunder; and that it has not in estimating the contract price or compensation demanded by it, included any sum by reason of any such brokerage, commission, or percentage; and that all moneys payable to it hereunder are free from obligation to any other person for services rendered, or supposed to have been rendered, in the procurement of this contract. The contractor further agrees that any breach of this warranty shall constitute adequate cause for the annulment of this contract by the United States, and that the United States may retain to its own use from any sums due or to become due hereunder an amount equal to any brokerage, commission, or percentage so paid or agreed to be paid."

All of the trucks purchased from the appellee were delivered to the Government, in accordance with the terms of said contracts, at Kenosha. At the time of delivery the destination of the trucks was regarded as a military secret, and was not disclosed to the appellee until some time afterwards. They were shipped by the officers of the Government who received them to about one hundred different places in the United States. Some of them were sent to training camps, some to storage points and some to ports of embarkation, and Colonel Strayer, Quartermaster Corps, United States Army, testified that "when demands were made from the American

forces in France for motor driven vehicles they were shipped from any available source, from cantonments, training camps, storage points or ports of embarkation." He further testified that 7,535 Nash trucks were ultimately shipped by the Government to the United States Army in France, that some of them were received in France after the armistice was signed, and all of them were received prior to July 25th, 1919; that "all of the trucks that were sent to France were sent by the United States for war purposes, and were used for war purposes in some one of the territories in which our operations were being carried on"; that in June and July, 1918, the United States Army in France turned over 200 Nash trucks to the French in the Chateau Thierry District"; that about a year later 150 Nash trucks were turned over to the French Government in Coblentz, Germany; that in 1919, 10 Nash trucks were sold to the "Government at Latvia" and 50 to the "Government of Esthonia"; that 1,373 were sold to a British corporation from the excess stock of the army of occupation near Coblentz, Germany, and that the balance, less 935 "that had been salvaged or destroyed," were turned over to the French Government "in the general turnover," or bulk sale, of stock of the American forces in France, as of July 25th, 1919, "after peace was signed."

At the conclusion of the evidence the court below held that the plaintiff was not entitled, under his contract of August 3rd, 1915, and the amendments thereof, to commissions on sales of trucks made by the defendant to the United States Government, and so instructed the jury, and from the verdict and judgment rendered in accordance with that instruction, the plaintiff has brought this appeal.

By the first paragraph of the contract sued on, the plaintiff was given the "sole right" to sell the trucks and products of the manufacturer, the Jeffery Company, in the countries of France, Servia and Belgium, and the second pararaph provided that the "sole right" so granted the plaintiff should include the right to sell the trucks, &c., "of (to) the countries

named and to any and all of them, and also to or for the governments of the countries named for use by them without the said territory." The only right granted by these paragraphs was the sole right to sell (1) *in* the countries named, (2) *to* any of the countries named, and (3) *to* or for the governments of those countries "for use by them without the said territory." It is clear that these paragraphs do not in terms include the sales referred to in this case. They were not made in the countries named, or to any of those countries, or to or for the governments of those countries for use by them without said territory.

Paragraph 5 provided that the manufacturer should collect the purchase price of all trucks sold and delivered in the territory mentioned in the first paragraph, and that the compensation of the plaintiff should be a certain per cent. of the list price of the same, and a certain per cent. of the list prices "of all parts or other property sold by the manufacturer in or for the territory." Paragraph 6 provided that upon the collection by the manufacturer from the purchasers of trucks "or other products, sold in or for said territory," it should immediately account to the plaintiff for the portion thereof due him, and in paragraph 7 the plaintiff agreed to use his best efforts during the term of the contract to make sales of the trucks and other products of the manufacturer "in the territory described." Paragraph 10 provided that it was the "intent and purpose of the parties" that the agreement should "apply to cover and include all sales" of trucks or other products of the manufacturer "in and for the territory herein described, whether such sales are made directly or indirectly by or through said dealer, directly or indirectly by the manufacturer," and in paragraph 12 the manufacturer agreed not to sell any of its products "to parties other than the dealer for resale in or for the territory" named, and to include in all contracts for the sale and delivery of its products outside of the United States the ultimate destination of the products contracted for, and also a stipulation that the "con-

tractants" "shall not directly or indirectly resell the products in or for the territory herein mentioned."

Learned counsel for the appellant contend that the terms "in or for" used in the several paragraphs to which we have referred should be construed to mean "in or for use in" the territory specified in the first paragraph of the contract. We fail to discover anything in the contract itself or in the circumstances under which it was executed to warrant that construction. The specific grant of the exclusive right to sell the trucks or products of the manufacturer is contained in the first and second paragraphs of the contract, and the words "in or for" in the subsequent paragraphs were evidently intended to embrace all sales covered by the terms of that grant. If the parties had intended by the subsequent paragraphs to enlarge the right given the appellant in the first and second paragraphs, they could easily have done so in clear and unequivocal terms, and if, as contended by the appellant, they had reason to believe that the United States would ultimately enter into the war, and had intended to include in the contract sales made by the manufacturer in this country to the Government of the United States of trucks and products for use in France, it is unreasonable to suppose that they would have left such an important item of their agreement to doubtful construction. They distinctly provided for sales made in the countries named, to said countries, and to the governments of said countries for use by them without said territory, and they could, with equal distinctness, have provided for sales made in this country to the United States Government of trucks, &c., for use in France. The parties used the words "for use" in the second paragraph when referring to sales of trucks, &c., to the governments of the countries named for use in other territory, and would naturally have used the same terms to express their intention to include sales made in other countries for use in France. The reference in paragraph 4 to the prices at which trucks, &c., should be sold "to a country engaged in war" cannot be construed to extend

the exclusive right granted to the plaintiff to any country engaged in war, when that exclusive right is expressly limited by paragraphs 1 and 2 to the countries therein named. Construing the remaining paragraphs in accordance with the plain terms of paragraphs 1 and 2 removes all doubt as to the meaning of the parties to the contract, whereas a departure from those terms would result in confusion, and an extension of the plaintiff's right beyond the obvious intention of the parties.

The cases of *Marshall* v. *Canadian Cordage, etc., Co.,* 160 Ill. App. 120; *Thompson-Houston Electric Co.* v. *Berg,* 30 S. W. 454, 10 Tex. Civ. App. 200; *Caro* v. *Mattei,* 39 Cal. App. 253, and *Garfield* v. *Peerless Motor Car Co.,* 189 Mass. 389, cited and relied on by the appellant, do not go to the extent of supporting plaintiff's claim in this case. In the case of *Marshall* v. *Canadian Cordage, etc., Co.,* the company sold the product of its factory to a third person who was a dealer in such goods and by his direction shipped the goods for resale into the territory for which the plaintiff was the exclusive agent of the cordage company. The cordage company had on previous occasions allowed the plaintiff commissions on sales made by it in the plaintiff's territory, and the court held that under the terms of the contract, "and the construction of it by the parties" the plaintiff was entitled to recover commissions on the sales involved in that case. In the case of *Thompson-Houston Electric Co.* v. *Berg,* the Court of Civil Appeals of Texas held (quoting from the syllabus): "Where the contract between the manufacturer of electrical supplies and his agent provides that the agent shall receive a percentage of all products to be used in a certain territory, the fact that a contract for the sale of goods to be used in such territory is made by the principal outside of the territory is immaterial." But in the later Texas case of *Nickels* v. *Prewitt Auto Co.,* reported in 149 S. W. 1094, the same court held (quoting from the syllabus): "Where a contract gave defendant the exclusive right to sell certain automobiles

and supplies in a fixed locality, plaintiff did not violate the agreement by selling to a resident of that locality at its own place of business, which was outside of the boundaries fixed by the contract." In case of *Caro* v. *Mattei*, where the sale of goods was made by the principal outside of the agent's territory, but for delivery in his territory, and where there was evidence of a construction of the contract by the parties, and of an established trade usage entitling the agent to commissions on such sales, the court held the agent was entitled to recover, and in the case of *Garfield v. Peerless Motor Co.* the agent was allowed to recover commissions where the contract of sale was made outside of the agent's territory to a resident of that territory, and where there was evidence of a trade usage entitling him to commission on such sales.

In the case at bar the trucks in question were not sold to a resident of the plaintiff's territory, or to the government of either of the countries named in his contract, but were sold and delivered in this country to the Government of the United States. The fact that during the prosecution of the war two hundred of said trucks were ultimately turned over to the French army in the Chateau Thierry district does not entitle the plaintiff to commissions on the prices of those trucks. They were not sold by the manufacturer, directly or indirectly, to the government of France, and were not, so far as the evidence discloses, sold for resale in France or to the French government, but were sold in this country to the United States Government for the use of its own army, or for the use of the War Department of the Government.

As the plaintiff's claim rests entirely upon the contract of August 3rd, 1915, and the amendments thereof, and as the sales made by the appellee to the United States Government and referred to in this case are not covered by the terms of that contract, we must affirm the judgment of the court below.

*Judgment affirmed, with costs.*