Anna Henderson, as Administratrix of the Estate of Edward Henderson and Anna Henderson v. Massachusetts Bonding & Insurance Company, a Corporation, Garnishee of F. A. Scharlott, Inc., a Corporation, Appellant.—84 S. W. (2d) 922.

Division One, July 9, 1935.*

*NOTE: Opinion filed at September Term, 1934, April 17, 1935; motion for rehearing filed; motion overruled at May Term, July 9, 1935.

(1)

2

*Leahy, Saunders & Walther, Harold F. Hecker* and *Lyon Anderson* for appellant.

*C. O. Inman* for respondents.

HYDE, C.—This is a garnishment proceeding, instituted to collect a judgment obtained by plaintiff and her deceased husband against F. A. Scharlott, Inc., for the wrongful death of their minor son. The matter was tried by a jury, which returned a verdict in favor of respondent for $8491.05. Appellant has appealed from the judgment entered on this verdict.

Respondents' contention was that appellant was liable to the Scharlott Company on a public liability insurance policy which provided that "loss from an accident resulting in bodily injuries or death to one person shall be limited to Ten Thousand and no/100 Dollars ($10,000.00) and, subject to the same limit for each person, the company's total liability for loss from an accident resulting

in bodily injuries or death to more than one person shall be limited to the sum of Twenty Thousand and no/100 Dollars ($20,000.00).'' Respondents.' twelve-year-old son was in the company's store on June 29, 1929, looking at fireworks, displayed there on a thirty-foot table, when the electric lights above the table fell upon it and ignited the fireworks and caused him to receive burns from which he died. Respondent and her husband obtained a judgment against the Scharlott Company for $7,500, and had failed to collect from that company. Appellant denied liability to the company and in the garnishment proceeding on the ground that the keeping of fireworks violated the provisions of the policy and voided its liability thereon.

Applicable provisions of the policy were as follows:

''Name of assured, Frank A. Scharlott, Inc. Post office address, 3948-52 West Florissant, St. Louis, Missouri. The assured is corporation. The policy period shall be twelve months from January 28th, 1929, to January 28th, 1930. . . . Location of insured premises, 3948-52 West Florissant Avenue, St. Louis, Missouri. The premises are occupied as Retail Dry Goods Store. . . .

''No explosives are made, sold, kept or used on the insured premises, except as follows: (no exceptions) . . .

''No agreement or condition of this policy shall be waived or altered except by endorsement attached hereto, signed by the president, a vice president, a secretary or an assistant secretary of the company, nor shall notice to or knowledge possessed by an agent or any other person be held to effect a waiver or change in any part of this policy unless endorsed hereon and signed as above provided. . . .

''Statements. The statements contained in the Schedule forming a part of the policy are made by the assured and by the acceptance of this policy the assured warrants the same to be true, except such as are matters of estimate only. This policy is issued upon such statements and in consideration of the premium as in the policy provided.''

It was shown that the Scharlott Company obtained all of its insurance through Mr. Charles Wharton. Wharton represented several fire insurance companies for which he had authority to countersign policies. He had no authority to countersign policies for appellant and had no written contract of any kind with it and did not write the policy in dispute, but had received from appellant instructions, outlining the various policies that appellant issued, rates, and sample policies at various times. He had solicited the business from Mr. Scharlott, gone to the branch office of the appellant in St. Louis and seen Mr. Buckley who wrote the policies for appellant. He had no written application from Scharlott, but had the data on a memorandum paper and told Mr. Buckley verbally what kind of a policy he wanted. Wharton had obtained liability insurance

from appellant for Scharlott for prior years. He collected the premiums from Scharlott and paid appellant the net amount, less his commission. Wharton kept a record of all of the insurance policies he sold to Scharlott and left a copy of the list, at his store, showing the expirations. He would remind him when his policies were about to expire and ask to rewrite them. Wharton had been familiar with Scharlott's business for many years and was frequently in his store. He knew that fireworks were kept for sale and sold in the store, around the Fourth of July, each year. He related his conversation with Mr. Buckley about issuing the policy as follows:

"Mr. Buckley asked me how long the man was in business, the first question he probably asked, the class of merchandise that he carried. I explained to him that he carried a general line of variety goods, including hardware, tinware, glassware, dry goods, notions and valentines, holiday goods, fireworks. The policy was issued after that conference with Mr. Buckley. That policy was sent to me and I delivered it to Mr. Scharlott. . . . I procured the information which I gave the Massachusetts from Mr. Scharlott and my own observation. When I gave the Massachusetts this information I looked to see what the answer was to the warranty, exception number eight in the schedule, 'no explosives are made, sold, kept or used on the premises and no exception.' . . . The information we gave the company was a general variety store carrying all kinds of merchandise. What the company wrote on there was an error and got it confused probably with the Scharlott Mercantile Company, which is a dry goods store. . . . It wouldn't make any difference with the responsibility of the company, the rate involved, whether it was called a variety store or a dry goods. The rate would be the same. . . . When this policy was issued, the fireworks were not there, not in January. I told Mr. Buckley he carried fireworks for the Fourth of July season."

Mr. Scharlott stated the nature of his business as follows:

"My company conducted a 5 cents to a dollar store there at that time. We sold everything in that 5 cents to a dollar store that would necessarily go in a store of that kind, such as notions, dry goods, candy, hardware items, toilet goods, tinware, and fireworks. Anything that would apply to any season, such as Christmas or Fourth of July, Thanksgiving or any holiday, Washington's Birthday, or anything that would apply to any holiday, we handled merchandise accordingly. We sold fireworks for the Fourth of July, and we got these fireworks on our premises on June 20, I would say, before this accident."

The fireworks on hand on June 29, 1929, consisted of about two gross of small Roman candles, about one gross of larger ones, skyrockets, including about a dozen large sized two-pound skyrockets, several cases of two-inch salutes, five to eight in a box and

100 boxes in a case. There were about 800 of these on the table; they would explode with a loud noise and blow their covering to pieces; they were marked "Dangerous to Hold," and "would injure your hand very badly," if held. There were also smaller fire crackers, torpedoes, mines, Vesuvius fountains, flower pots, dago bombs and pin wheels. Dago bombs contained a charge of black powder, which exploded under a bomb and drove it 80 to 100 feet in the air, so that the bomb would then explode in the air with a scenic effect. Mines were similar. Flower pots and Vesuvius fountains contained a composition that had the elements of gunpowder in different proportions so as to burn and make a display of fire instead of exploding. Mr. Scharlott said that he generally read his policies and had looked over this one. After the explosion and fire in the store, appellant denied liability and tendered back the premium on the policy to Mr. Scharlott but he refused to accept it.

Appellant contends that the court should have directed a verdict in its favor because it was entitled to insist upon a forfeiture of the policy by reason of the keeping of fireworks for sale on the insured premises, which it contends was contrary to the express terms of the policy; and because there could be no waiver or estoppel, under the evidence, to assert its right to insist upon the forfeiture. Appellant cites the cases holding that knowledge, at the time the policy was written, of an intention to violate a prohibition in the policy, at some future time (here by bringing in fireworks during the Fourth of July season), cannot be made the basis of waiver of or estoppel to assert such provision. The cases so hold (26 C. J. 320-323, secs. 395-401; 14 R. C. L. 1170, sec. 348), but our view is that this case does not involve that rule because the policy did not prohibit keeping fireworks for sale.

The construction of insurance contracts is governed by the same general rules as are applied to the construction of other written contracts. "The function of the courts is to construe them, not to make them." Nevertheless, since the policies are prepared by the insurer, the insured usually has no voice in the wording of his contract but must, to a large extent, take it as it is written. It is, therefore, well established that where the meaning of a policy provision is doubtful or susceptible of different constructions, the policy should be construed strictly against the insurer and liberally in favor of the insured. [26 C. J. 70-75, secs. 69-70; 32 C. J. 1147-1159, secs. 257-268; 14 R. C. L. 925-33, secs. 102-106; L. R. A. 1917C, 279, note.] The insurer has the opportunity to have the language of the contract selected with great care and deliberation by experts and legal advisors acting exclusively in its interests and it is responsible for any ambiguities found therein. Generalities usually make ambiguities. The insurer can always pre-

vent the necessity of strict construction against it, or any construction at all, by stating the terms of any provision so clearly, definitely and specifically as to make its meaning so plain that no room is left for construction. This, appellant here did not do in the statement that "no explosives are made, sold, kept or used on the insured premises." Is there not a difference between "explosives," as used and sold commercially, and articles which are not ordinarily designated as "explosives" but which do contain some explosive material? What would the average business man think this meant when reading it in his policy? Shotgun shells, rifle cartridges, fire crackers and Roman candles? We think not. There is no doubt that gunpowder is an explosive. Shotgun shells and rifle cartridges contain gunpowder, but would any merchant consider that such a prohibition against explosives would prohibit him from carrying in his store rifle cartridges and shotgun shells? Is not the same thing true of fireworks? Fireworks have been given the following definition: "A contrivance of inflammable and explosive materials combined of various proportions for the purpose of producing in combustion beautiful or amusing scenic effects, or to be used as a night signal on land or sea, or for various purposes in war." [2 Bouvier's Law Dictionary, 1232.] An explosive is "a compound or mixture susceptible of explosive chemical reaction, as gunpowder or nitroglycerine." [Webster's Dictionary.]

The only case we find in which a similar question has been directly decided is Tischler v. California Farmers' Mutual Insurance Co. (Cal.), 4 Pac. 1169. There, the policy provided that it should be void if gunpowder was kept on the premises. It was contended that the keeping of fireworks violated this provision but the court held that it did not, saying:

"It remains to consider whether the fireworks kept by the plaintiff rendered void the policy under that provision of it prohibiting the keeping or use on the premises of 'gunpowder.' Defendant introduced no testimony tending to show of what the fireworks were composed. They may be composed of various combustible materials, usually, we believe, of preparations of gunpowder, sulphur, and some other inflammable material or materials. But although gunpowder may be, and usually is, one of the constituents of fireworks, it by no means follows that 'fireworks' are 'gunpowder.' The latter is 'a mixture of saltpeter, sulphur, and charcoal, separately pulverized, then granulated and dried.' It was the mixture called gunpowder, which, along with phosphorus, camphene, gas, and chemical oils, the plaintiff was by the policy in question prohibited from keeping or using on his premises without the written consent of defendant, under penalty of rendering the policy void. If defendant wished to provide that the policy should be void in the

event the insured should keep fireworks, it ought to have said so, as other companies do.''

We, likewise, think that if appellant intended to prohibit the keeping of fireworks in respondent's store, as a condition for carrying its liability insurance, it could and should have plainly said so. It should not be permitted to ambush a policyholder from behind a general term which ordinarily could be understood to mean explosives, commercially used and sold as such, rather than articles which, although they do contain some explosive material, are commonly known by another designation. When our Legislature undertook to prohibit the transportation of dangerous explosives upon passenger vehicles and to regulate its shipment in all others, it specifically stated the materials it intended to prohibit and regulate. [Secs. 4163-64, R. S. 1929.] When it undertook to give a city power to restrain the use of firearms and fireworks and to regulate the storage of various explosives in or near the city, it named specifically the articles and materials to be restrained or regulated. [Sec. 6486, par. 9, R. S. 1929.] When the Congress of the United States desired to regulate the transportation of explosives in interstate commerce, it definitely designated the materials it meant to regulate and put in another class those not so regulated such as fireworks and small arms ammunition. [Title 18, chap. 9, secs. 382-83-84-85, U. S. C. A.] The same thing is true of the regulations of the Interstate Commerce Commission authorized thereby. [See Huckleberry v. Missouri Pacific Railroad Co., 324 Mo. 1025, 26 S. W. (2d) 980.]

The word ''explosives'' has been construed, under various circumstances, not to cover specific things which do explode or contain explosive material. In Wechsler v. State of Ohio, 179 N. E. 356, the possession of cartridges for use in firearms was held not to violate a section of the criminal code prohibiting the possession of ''any cartridge, shell, bomb or similar devise, charged or filled with one or more explosives, intending to use the same or cause the same to be used for an unlawful purpose.'' In State v. Turco, 122 Atl. 844, it was held that shooting a man with a pistol did not come within the statute concerning killing by the use of dynamite or any other explosive. In Schwartz v. Northern Life Insurance Co., 25 Fed. (2d) 555, the manager of a corporation engaged in the manufacture of artificial silk was killed by the explosion of chemicals used in the process of making artificial silk. It was contended that his life insurance policy was void because it provided that the company was not liable if ''the insured engaged in the manufacture or handling of explosives.'' The court held the company liable, saying: '' 'An explosive may be defined as any substance by whose decomposition or combustion gas is generated with such rapidity that it can be used for blasting or in firearms.'

[25 C. J. 181, Century Dictionary.] The chemicals used by the Cellulose Company were not explosives in that sense." A similar contention was made in Anchor Life Insurance Co. v. Meyer (Ind.), 111 N. E. 436. There the insured was killed by the explosion of a steam engine used in operating a sawmill. His insurance policy prohibited him from "making or using explosives." The court held "that the assured, while assisting in running a steam engine in connection with the operation of a sawmill, as disclosed by the second paragraph of answer, was not engaged in 'making or using explosives' within the terms of the policy of insurance." [See, also, Patterson v. Roxana Petroleum Co. (Okla.), 234 Pac. 713; Flynn v. Butler (Mass.), 75 N. E. 730; Washburn v. Miami Valley Insurance Co., 2 Fed. 633.]

The evidence in this case shows that appellant had carried respondents' liability insurance for several years prior to the issuance of the policy now in dispute; that appellant's St. Louis underwriter Buckley knew what kind of a store it was; and that he was told that it did handle fireworks. Writing the policy with this knowledge, it would seem reasonable to believe that Mr. Buckley did not himself consider that the provision about explosives covered fireworks. There is no showing that appellant charged a higher rate for variety stores that sold fireworks. Since appellant chose to use the general term "explosives" rather than to specify definitely any articles or materials to be prohibited, and did not designate specifically "fireworks" as prohibited articles, we think the above cases are sufficient authority for holding that, upon a strict construction of the word "explosives" as applied to the circumstances of this case, the policy issued to respondent did not prohibit keeping fireworks for sale, and we so hold. The judgment is affirmed. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.