Benjamin F. WEINBERG et al., doing business as Hotel Kansas Citian, Plaintiffs-Respondents,

v.

GLOBE INDEMNITY COMPANY, Defendant-Appellant.

No. 23400.

Kansas City Court of Appeals.

Missouri.

Feb. 5, 1962.

Rodger J. Walsh, Davis, Thomson, Van-Dyke, Fairchild & Walsh, Kansas City, for defendant-appellant.

George V. Aylward, William B. Teasdale, Kansas City, for plaintiffs-respondents.

CROSS, Judge.

The defendant insurance company appeals from a jury verdict and judgment awarding plaintiff policy holders the sum of $2396.20 on their claim for indemnity of a loss caused by burglary of their business premises and the theft of a sum of money.

The petition contains two counts. In count one plaintiffs sue to recover for their loss under a robbery and theft policy issued by defendant. In the second count plaintiffs sue to recover the amount of an agreed settlement of the loss made by defendant's adjuster. In answer, defendant admits issuance of the policy and denies all other allegations of the petition. No policy exclusions or exceptions are pleaded in defense. The cause was submitted to the jury on the second count only. The resulting verdict and judgment are in plaintiffs' favor for the claimed amount of $1492.00, interest in the sum of $255.00, attorneys fees in the amount of $500.00, and a penalty of $149.20 for defendant's vexatious refusal to pay plaintiffs' claim—a total sum of $2396.20.

Defendant first assigns that plaintiffs failed to make a submissible case for the jury and that the trial court erred in refusing to direct a verdict for defendant at the close of all the evidence. Defendant's principal argument is that the evidence did not support the finding that its adjuster made a settlement of the loss or that there was an accord and satisfaction entered into by the parties. The assignment requires our review of the evidence.

Defendant issued the policy on October 7, 1954, in the face amount of $3500.00, for a term of five years, in consideration of a premium paid by plaintiffs. It is written on a form entitled "Paymaster, Messenger and Interior Robbery Policy", but is limited to a single insuring agreement, which reads as follows:

"III Interior Robbery

"To Indemnify the Insured for all loss of or damage (hereinafter called loss) to Money, Securities and other property, while in the Premises, and for damage to the Premises if the Insured is the owner thereof or is liable for such damage, provided such loss is occasioned by:

"(a) Robbery or Attempt Thereat from a custodian while within the Premises;

"(b) The stealing of such property from within the premises by means of compelling a Custodian or Messenger by violence or threat of violence while outside the Premises to admit a person thereinto or to furnish him with means of ingress into the Premises, provided such loss shall occur before the Premises are next opened for business;

"(c) the stealing of such property from within a show window in the Premises while regularly open for business, by a person who has broken the glass thereof from outside the Premises, or by an accomplice of such person".

Plaintiffs operate the Hotel Kansas Citian in downtown Kansas City. The auditing and fiscal operations of the hotel, including the counting of money, are carried on in a small "auditor's" office on the mezzanine floor—a "glassed in" enclosure about the size of a jury box, "glassed in all the way down", and visible from the lobby. The back wall of the office is the outside wall of the building. It contains two exterior windows. Three employees ordinarily work in the enclosure during business hours: Mr. Alford, the hotel manager; Miss Thornberry, the auditor; and Mrs. Everett, assistant to the auditor.

On August 12, 1959, shortly after noon, the employees locked the door of the glass office and went to lunch. Upon their return around one o'clock they discovered that an exterior glass window had been broken. They found a large rock and shattered glass on the floor, and observed that the broken window had been raised. The hotel's cash box on the desk was open and the currency it contained had been removed. There was some blood on the desk near the cash box.

Plaintiffs immediately called the police and reported a burglary and notified defendant's agency office of the theft. Defendant's adjuster, Earl Jones, arrived at the hotel shortly after one o'clock while the police were conducting their investigation. He saw shattered glass on the floor and the broken window which was "down". He talked to "the women that were there in the room". Miss Thornberry told him a burglary had occurred between 12:15 and 1 o'clock. He took some notes, "left a set of proof of loss with the assured", and took his departure. As he left the hotel he met Mr. Frank G. Langsford, defendant's regular adjuster for that particular district. Jones informed Langsford of the burglary and that the police were still "investigating". Langsford went immediately to the hotel and up to the auditor's office. He saw the broken window and glass fragments on the floor. He talked to Mr. Alford, the manager, and gave him blank proofs of loss. Mr. Langsford then conferred with Miss Thornberry and Mrs. Everett, assisted them in calculating the loss, observed them counting the money that was not taken—"the heavy, the coins", and "figured" the amount of loss was $1482.00.

Adjuster Langsford testified that "a day or two later" he returned to the hotel to confer regarding the amount of the loss—"to reaffirm our first calculation". He asked for and received various money receipts, a page from the hotel's cash journal, and requested a statement in the form of a letter from Miss Thornberry showing her calculation of the loss. He ran adding machine tapes on various money items and finally "arrived at the loss which corresponded with their claimed loss"—again, in the sum of $1482.00. Langsford testified, "We came to a verbal agreement on the amount of

loss" and that "We all said it was a burglary loss".

Plaintiff Weinberg testified that defendant's adjuster came to the hotel on August 14 (two days after the loss) and prepared the proof of loss which plaintiffs submitted; that the adjuster said "We are ready for the proof of loss to pay you. I'll draft it up. I can do it right in your office here at the hotel"; that the adjuster dictated the contents of the proof of loss fixing the amount of loss by theft at $1482.00 and property damage in the sum of $10.00, describing the latter as "a broken window" and stating that "a thief broke glass to open window and gain entry to auditor's office where he took all currency from cash box". Weinberg executed the proof of loss before a notary on August 14th and delivered it to Langsford.

In the course of his investigation, Langsford obtained a copy of the police report. On August 19th he received the letter he had requested of Miss Thornberry explaining her computation of the loss. He returned to the hotel once more "to complete my investigation and verification of the loss".

Sixteen days after the hotel burglary and after discussing the claim with "our branch claims manager" Langsford issued a draft dated August 26, 1957, payable to plaintiffs in the amount of $1492.00, and reciting that it was *"In full settlement of all claims for liability under Policy GBP 259613 for loss which occurred on or about August 12, 1957"*. Each of the thirteen payees endorsed the draft below the following statement printed on the back of the draft: *"Endorsement of this draft by payee or payees is acknowledgment of full settlement, satisfaction, compromise and discharge of claims and demands of every nature and kind for loss, damage, injury or expense as set forth on the face of this draft"*. So endorsed, the draft was deposited in the hotel bank account.

Langsford also required the payees of the draft to sign and acknowledge separate receipts and releases wherein each of them further acknowledged the payment as *" * * * in full settlement and final discharge of any and all claims arising under or by virtue of policy of insurance No. GBP 259613"*. Langsford admitted that when he issued the draft he was fully advised and informed, and in possession of all the facts concerning the occurrence of the loss. There was a copy of the policy in the Kansas City office from which he worked.

Defendant stopped payment on the draft without returning the releases.

In determining the sufficiency of evidence to establish that there was a compromise and settlement, we are mindful of the well-established rule stated in 45 C.J.S. Insurance § 1102, p. 1338, as follows: "The acts of an adjuster within the apparent scope of his authority are binding on the company in the absence of notice to insured of limitations on his powers. Thus, having investigated the circumstances of a loss, an adjuster, on whose powers insured knows of no limitation, may go further and settle the loss, and bind the insurance company which he represents by his action". And, as held in Curtis v. Indemnity Company of America, 327 Mo. 350, 37 S.W.2d 616, it is not incumbent upon the plaintiff insured to plead and prove that defendant insurance company's adjuster had authority to settle the loss. That authority may properly be inferred from all the facts and circumstances in evidence.

Defendant attempts to avoid the consequence of its adjuster's acts on its behalf by the unpleaded affirmative defense that: (1) the loss was caused by burglary; (2) there was no burglary coverage; (3) the only coverage afforded by the policy is for loss from robbery as defined under Condition A, and limited to loss from a forceful taking by violence or fear of violence from a custodian or by other felonious act committed in his presence. Hence, defendant insists, "The mere fact that the adjuster investigated, gave a proof of loss and issued a draft does not make coverage for a bur-

glary loss where there is no burglary policy".

We concede that the evidence conclusively establishes a burglary loss. When Langsford issued the draft and releases, all the parties and their employees who had knowledge of the facts were in agreement that the theft loss arose by reason of the burglary. It is apparent there was no robbery by force or imposition of fear and that there is no indemnity provided for plaintiffs' loss by the robbery coverage. However, defendant's claim that there is no burglary coverage is untenable and directly contrary to the plain terms of the policy. Insuring agreement III (c) covers loss by burglary in explicit language and by these words: "(To indemnify the insured for loss of money, occasioned by) the stealing of such property within a show window in the premises while regularly open for business, by a person who has broken the glass thereof from outside the Premises, or by an accomplice of such person". Such defined causation of loss cannot be considered as anything other than burglary.

Applying the facts in evidence to the specifications of Insuring agreement III (c), we observe that plaintiffs' property was stolen while the hotel was open for business, by a person, (or accomplice) who broke the glass of a window in the locked glassed in office, from the outside of the premises. The policy does not define "show window". But, if the place or window in question is considered to be a "show window", then there could be no question that defendant's policy insured the loss sustained, or that the adjuster had authority to settle the claim. It is not our function to interpret those words. It is, however, for us to determine whether plaintiffs, in good faith, were asserting a claim on their policy that had at least an *appearance* of merit sufficient to raise a "possible doubt" in their favor. If so, their claim was one that the adjuster was authorized to settle, since it was then unliquidated.

The law is well settled that any dispute that can be the subject of an action of colorable merit may be the basis of a compromise. The law favors compromise of doubtful claims, and forbearance may be a sufficient consideration for such compromise, even though the claim upon which it is based should develop to be ill-founded. The fact that, had the parties proceeded to litigate the claim, one of them would certainly have won, does not destroy the consideration for the compromise, for the consideration is said to be the settlement of the dispute. The merits of the controversy will not be considered after the parties have agreed upon a compromise. Duncan v. Black, Mo.App., 324 S.W.2d 483, and cases cited. Also see Cone v. Equitable Life Insurance Co., Mo.App., 310 S.W.2d 29; Yancey v. Central Mutual Ins. Ass'n, Mo. App., 77 S.W.2d 149, and cases cited. Duncan v. Black, supra, comprehensively defines the essential nature of a "doubtful" claim which is subject to binding compromise, as follows:

"But there are certain essentials to the validity of such consideration. For one thing, and by all authority, the claim upon which the settlement is based must be one made in good faith. Of that there is no dispute in this case. Secondly, the claim must have *some* foundation. As to this second consideration we find the courts using varying language. The claim cannot be 'utterly baseless.' It has been said that it must have a 'tenable ground,' or a 'reasonable, tenable ground.' It must be based on a 'colorable right,' or on some 'legal foundation.' It must have at least an appearance of right sufficient to raise a 'possible doubt' in favor of the party asserting it. This is the Missouri rule.

"It is difficult to reconcile the antinomous rules and statements which are applied to the 'doubtful claims' and to find the words which will exactly draw the line between the compromise (on

the one hand) of an honestly disputed claim which has some fair element of doubt and is therefore to be regarded as consideration and (on the other hand) a claim, though honestly made, which is so lacking in substance and virility as to be entirely baseless. The Missouri courts have struggled and not yet found apt language. We think we had best leave definitions alone, confident that, as applied to each individual case, the facts will make the thing apparent. But if we should make further effort to distinguish we would say that if the claimant, *in good faith,* makes a mountain out of a mole hill the claim is 'doubtful.' But if there is no discernible mole hill in the beginning, then the claim has no substance".

We identify the mole hill in this case as the burglary indemnity clause. That covenant affords tenable and reasonable ground for the claim that plaintiffs' burglary loss was covered by the policy. At least, the provision is sufficient to raise a possible doubt in favor of plaintiffs. The doubt arises from defendant's use of the words "show window" in its policy, without definition. If that term were before a reviewing court for interpretation under the facts in this case there would be substantial grounds for a contention that the money was stolen from a "show window". It is elementary that the terms of an insurance policy will be given a liberal construction so as to uphold it and accomplish the purpose for which it is written rather than a strict, technical construction which may defeat its purpose. 44 C.J.S. Insurance § 297, p. 1166; Grafton v. McGuire, 362 Mo. 882, 245 S.W. 2d 69. Missouri cases are legion which hold that if there is doubt or uncertainty as to the meaning of language used in a policy of insurance, and it is fairly susceptible of interpretation in favor of the insured, such meaning will be adopted. In Prichard v. National Protective Insurance Co., 240 Mo.App. 187, 200 S.W.2d 540, this court construed the term "office building" as applied to a two story building occupied on the first floor by a bank. On the second floor there were two offices and considerably more apartments used as living quarters. We there considered the term "office building" as ambiguous and construed its meaning so as to include the described building and to effect insurance coverage. The following is quoted from the Prichard opinion: "We are of opinion that where such a term is used, as in the present case, without qualification, its meaning and application are subject to any fair and reasonable interpretation consistent with the language used and with the facts and circumstances surrounding the parties at the time of the execution of the policy and at the time of the casualty. Under the facts of record, we hold that the Insurance Company is not entitled to any restricted meaning of the term 'office building' in the absence of any express limitation or exception, but that said term is one subject to latitude in meaning and that the court is entitled to accord to it a liberal construction in favor of the insured".

In Henderson v. Massachusetts Bonding & Ins. Co., 337 Mo. 1, 84 S.W.2d 922, the Supreme Court held that "fireworks" were not within a policy exception from liability by reason of "explosives" kept or sold on the premises. In the opinion Judge Hyde wrote: "The insurer has the opportunity to have the language of the contract selected with great care and deliberation by experts and legal advisers acting exclusively in its interests, and it is responsible for any ambiguities found therein. Generalities usually make ambiguities. The insurer can always prevent the necessity of strict construction against it, or any construction at all, by stating the terms of any provision so clearly, definitely, and specifically as to make its meaning so plain that no room is left for construction".

It would be of significance in determining the meaning of "show window" to consider the circumstances under which the policy was issued. Plaintiff Weinberg, acting for all plaintiffs, procured the insurance policy. He testified that he had been doing business

for years and "I always leave it up to my agent who I buy from, who is a very responsible man, who represented the Globe Indemnity, and I told him at the time I wanted to be covered for robbery and other ways, burglary, and so forth". It would be reasonable to believe that the Globe agent was familiar with the hotel's business and monetary operations, knew its hazards, and issued a burglary policy appropriate to cover them, in accordance with plaintiff Weinberg's instructions. Such a view would be consistent with that taken by the Supreme Court in the Henderson (fireworks) case, supra, stated as follows: "The evidence in this case shows that appellant had carried respondents' liability insurance for several years prior to the issuance of the policy now in dispute; that appellant's St. Louis underwriter, Buckley, knew what kind of a store it was; and that he was told that it did handle fireworks. Writing the policy with this knowledge, it would seem reasonable to believe that Mr. Buckley did not himself consider that the provision about explosives covered fireworks".

■■■ The parties themselves have already construed the insurance contract by their own conduct under it. They have placed a practical construction upon it by their acts in the nature of a complete settlement and compromise. Such construction as made by the parties is entitled to great, if not controlling weight in determining the proper interpretation of the contract, and will generally be adopted. 17 C.J.S. Contracts § 325. Since the words "show window" are undefined, and their intended meaning is doubtful, it would be reasonable to interpret them in such manner as to provide indemnity inasmuch as the parties themselves have understandingly acted in accord to pay and receive indemnity.

■■■ It is our conclusion that plaintiffs, in good faith, were asserting an unliquidated claim of substantial legal foundation, based on reasonable, tenable grounds, sufficient to support a valid compromise and settlement between the parties—in the nature of an accord and satisfaction.[1] There is sufficient evidence from which the jury could find that the parties made a binding compromise and settlement of the claim amounting to an accord and satisfaction. We rule that the trial court properly refused defendant's motion for a directed verdict and that plaintiffs made a submissible case.

Defendant next contends that plaintiffs' verdict directing Instruction No. 1 is erroneous, because it undertakes to submit plaintiffs' claim under the policy on the basis of interior robbery but fails to hypothesize facts showing that the theft was a "robbery" as defined by the policy, and because the instruction combined and submitted contradictory theories of recovery, i. e., a claim on the policy and a claim on an agreement to settle. The factual premises set up by defendant in the assignment are incorrect. The instruction submitted no theory of recovery based directly on the policy, (upon plaintiffs' entitlement as policy holders). The instruction, in substance, told the jury that they should find for plaintiffs if they believed the currency was stolen while the policy was in effect *and if they further found that defendant's adjuster investigated the loss, agreed with plaintiffs to*

1. The following statement appears in 1 C.J.S. Accord and Satisfaction § 1, p. 464, "While courts and text writers have upon occasion attempted to distinguish between an 'accord' and a 'compromise,' or between an 'accord and satisfaction,' and a 'compromise and settlement,' the distinctions are, at best, somewhat shadowy, and of small practical importance, and, indeed, it has been said that the distinctions drawn are of little weight, and that they are usually unsound. The terms are, accordingly, often used interchangeably". In McGinnis v. Rolf, 239 Mo.App. 54, 189 S.W.2d 456, the court said "However, the distinction between compromise and settlement, and accord and satisfaction, is now regarded by most courts and authorities as slight, and the terms are often used interchangeably". See Fair Mercantile Co. v. Union-May-Stern Co., 359 Mo. 385, 221 S.W.2d 751, l. c. 754.

*pay same, issued a check as payment, and thereafter stopped payment on the check.*

 It is patent that the reference to the theft of currency while the policy was in effect, as contained in the instruction, was purposed only for identification of the original claim as a basis for submitting the issue of recovery on the new and substituted claim as arising from the effect of the agreed settlement. The instruction theorized that the policy claim had merged into the settlement claim and furnished the consideration for it. The essence of the instruction, as an hypothesis for recovery, is the required finding *that the adjuster agreed upon and made a settlement of the policy claim.* Therefore, it was unnecessary and would have been inappropriate to hypothesize any further facts to establish that a robbery had occurred. For the same reasons, we hold that there was no dual, contradictory submission of recovery theories under the instruction.

Defendant also claims that plaintiffs' Instruction No. 2 is erroneous. Defendant argues that it is not the law (as the instruction states) that an insurance adjuster has power to determine and agree upon the amount of a loss so as to bind the company "when there is no coverage for the loss". (We would not disagree with defendant's insistence if in fact there had been no apparent coverage for the loss in this case.) Defendant still argues that the policy insured plaintiffs only against loss from robbery and that it afforded no indemnity for burglary loss. Hence, defendant says, "The adjuster has no authority to change the policy from an interior robbery policy to a burglary policy". This argument has no foundation in reason or fact. There can be no controversy here over the adjuster's authority to "change the policy * * * to a burglary policy", because it was a "burglary policy" from the moment of its origin, as we have already demonstrated in this opinion. Defendant also urges that plaintiffs' Instruction No. 2 (verdict directing in its nature) should have hypothesized facts to the effect that there was a robbery.

What we have said relative to the same complaint, directed against plaintiffs' Instruction No. 1 finally disposes of defendant's third point.

 Defendant contends that the trial court erred in giving plaintiffs' Instruction No. 4, which told the jury that "if you * * * find * * * that the defendant paid plaintiffs—$1492.00 in full for all claims * * * and that the plaintiffs accepted said sum, such settlement operated as an accord and satisfaction of plaintiffs' claim and plaintiffs would be entitled to recover * * *". Defendant first argues that since plaintiffs had not pleaded that the parties had entered into an accord and satisfaction it was error to submit that issue in the instruction. In our opinion plaintiffs so pleaded in their petition by alleging that the parties entered into an agreement to settle plaintiffs' claim, that releases were taken, that defendant issued a draft in the amount agreed upon, and that thereby *the agreement was consummated.* It is not necessary that the petition set forth in specific words the legal conclusion that there was accord and satisfaction. It suffices that such conclusion results from the facts pleaded. In Green v. Kansas City, Mo.App., 107 S.W.2d 104, this court said, "It is well settled that an instruction need not be couched in the identical language of the petition provided it submits the issues therein contained".

 Defendant further complains that Instruction No. 4 permitted a finding that there was accord and satisfaction when there was no dispute between the parties. There is no ground for the complaint because the subject of agreement was plaintiffs' unliquidated claim on their policy. It is the law that *either* a bona fide dispute *or* an unliquidated claim will support an accord and satisfaction. 1 C.J.S. Accord and Satisfaction § 32; Laxton v. Retail Hardware Mutual Fire Ins. Co., 226 Mo.App. 954, 48 S.W.2d 144.

Defendant additionally charges that the giving of Instruction No. 4 was error for

the alleged reason it submitted the theory of accord and satisfaction when there was no evidence from which the jury could find there had been a *satisfaction* of plaintiffs' claim. Relying on the general rule that the mere issuance of a check or draft is not payment and that a satisfaction does not occur until payment of the check or draft has actually been received—defendant maintains that its act in stopping payment on the draft "constituted a repudiation of any agreement and there could be no accord and satisfaction". We cannot so hold, under the facts in this case, in view of certain principles of law which materially qualify the general rule relied on by defendant.

■ It is the settled law in Missouri that if the claimant or creditor agrees with the debtor (or tort-feasor) to accept a check *as payment* and not just as the "means" through which payment may be obtained, the claim or debt is extinguished by the mere acceptance of the check—that is to say that "payment" is effected and "satisfaction" occurs. Authority for the foregoing statement is found in defendant's own cited cases and text law, to-wit: Griffin v. Priest, Mo.App., 137 S.W.2d 685; Rhodus v. Geatley, 347 Mo. 397, 147 S.W.2d 631; Brent v. Westerman, D.C., 123 F.Supp. 835; 70 C.J.S. Payment § 24, p. 237. As stated in 70 C.J.S., supra, "Where a creditor agrees or consents to receive a check of his debtor as payment, the original indebtedness is thereby extinguished pro tanto, whether or not the check is actually paid by the drawee on presentment, and even though payment thereof is stopped by the maker".

■ The evidence before us shows conclusively that the parties expressly agreed in writing that the delivery and acceptance of the draft constituted payment of plaintiffs' claim as agreed upon in settlement, and that it constituted a "satisfaction" pursuant to an "accord". Such agreement is evidenced (1) by the words printed on the face of the draft: *"in full settlement for all claims for liability"*; (2) by plaintiffs' written endorsement of the draft under the printed legend *"Endorsement of this draft by payee or payees is acknowledgment of full settlement, satisfaction, compromise and discharge of all claims and demands of every nature and kind for loss, damage or expense as set forth on the face of this draft"*, and (3) by the receipts and releases executed and acknowledged by plaintiffs before a Notary Public, reciting that the draft was received *"in full settlement and final discharge of any and all claims * * "*. We conclude that the evidence contains an abundance of facts to show "payment" and "satisfaction" and to support the giving of Instruction No. 4.

■ Defendant's final assignment is that the trial court erred in refusing to give its proffered Instructions No. 9, No. 10 and No. 12. Instruction No. 9 is a definition of the policy terms limiting the authority of defendant's agents and adjusters. Those considerations are not pertinent to any issue before us. Instruction No. 10 is designated by defendant as "converse" to plaintiffs' Instruction No. 1. The trial court properly refused Instruction No. 10 because it erroneously permitted the jury to return a verdict for defendant if they found (among other things) that there was no burglary coverage in the policy. We note once more that Condition (c) is an agreement to indemnify plaintiffs for loss by burglary. Instruction No. 12, in its entirety, reads as follows: "The Court instructs the jury that the mere fact an adjuster for the defendant investigated the loss, submitted proofs of loss to the insured and issued a draft does not create burglary coverage where none existed in the first instance". The foregoing is generally abstract in nature, incomplete as an hypothesis, comments unduly on the evidence, and, contrary to the evidence, assumes that there was no burglary coverage. No error resulted from the trial court's refusal of the instruction.

The judgment is affirmed.

All concur.