**TITLE INSURANCE COMPANY OF MINNESOTA, a corporation, Plaintiff-Respondent,**

v.

**CONSTRUCTION ESCROW SERVICE, INC., a corporation, Defendant-Appellant.**

No. 47148.

Missouri Court of Appeals, Eastern District, Division Four.

June 29, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 28, 1984.

Application to Transfer Denied Oct. 9, 1984.

Charles M. Schmidt, Brackman, Copeland, Otting, Copeland, Walther & Schmidt, St. Louis, for defendant-appellant.

Robert C. Jones, Ziercher, Hocker, Human, Michenfelder & Jones, Clayton, for plaintiff-respondent.

GAERTNER, Presiding Judge.

Defendant Construction Escrow Services, Inc. (CESI) appeals from the judgment in this court-tried case entered in favor of plaintiff Title Insurance Company of Minnesota (Minnesota Title) on each of two counts of plaintiff's amended petition. Both counts were predicated on Minnesota Title's claim that CESI failed to perform its obligations under Construction and Disbursing Escrow Agreements relating to two different construction loans. Other-wise unrelated, the two counts require separate discussion on appeal.

## COUNT I.

Count I involved the construction and furnishing of a Howard Johnson Motel in St. Charles, Missouri. St. Charles Motor Inn Corporation (Motor Inn), as the contractor and owner, obtained financing in the amount of $1,600,000 from First Mortgage Investors (FMI). These two entered into an escrow agreement with CESI wherein the latter undertook to disburse the construction loan funds upon completion of various phases of construction. This agreement was an outgrowth of a commitment by Minnesota Title to insure FMI on condition that CESI disburse the funds. Included in the loan and, by rider in the escrow agreement, were funds to pay for furnishings and equipment of the motel. FMI's loan was secured by a first deed of trust on the real property and by a security agreement whereby FMI acquired a security interest in all property located on the real estate. A UCC Financing Statement pertaining to the furniture, fixtures and equipment was filed for record on behalf of FMI on August 28, 1972.

The escrow agreement provided that all furniture, fixtures, and equipment "shall be in place and fully paid at the time of completion of this project." Construction and furnishings were completed and the motel commenced operations on July 1, 1972, although at that date all disbursements and financial arrangements had not been completed. By September of that year, the only significant item on which disbursement had not been made was the furniture and equipment. One of the principals of Motor Inn requested direct payment for this item from CESI. The latter demanded that the normal course of dealing regarding disbursements be followed, i.e., Motor Inn should submit a request for disbursement to FMI which, in turn, would authorize CESI to make payment. On September 20, 1972, CESI received a telegram from FMI authorizing the release of monies held in escrow for furniture and equip-

ment directly to Motor Inn subject to receipt of "paid bills or other satisfactory evidence that the furniture and equipment presently located in the motel have been fully paid for." On September 21, 1972, CESI received a letter from Landmark Supply Division enclosing copies of invoices for furniture shipped to the motel but sold to Leasing Service Corporation at a cost of $132,395.92. CESI disbursed this sum directly to a principal of Motor Inn on October 3, 1972. On that same date CESI sent to Missouri Title Guaranty Co., the agent of Minnesota Title, a letter which enclosed a "Final Affidavit and Agreement" and further stated "please proceed with issuance of final policy." The enclosure consisted of the owner's affidavit that the work was completed and fully paid for and CESI's guarantee to Missouri Title Guaranty Company against loss by mechanics' or materialmen's liens. In reliance upon this notification, Minnesota Title issued its policy of insurance which contained the following provisions:

Title Insurance Company of Minnesota hereby agrees, insures and guarantees to the insured that the construction project referred to in that Construction and Disbursing Escrow Agreement dated August 16, 1971, between St. Charles Motor Inn Corporation, First Mortgage Investors and Construction Escrow Service, Inc. (the "Escrow Agreement") has been fully completed substantially in accordance with the plans and specifications referred to in the Escrow Agreement, and Title Insurance Company of Minnesota hereby insures against mechanics' and materialmen's liens respecting such project in the amount of this policy. Title Insurance Company of Minnesota further insures and guarantees the insured against all loss or damage resulting from the failure of said Construction Escrow Service, Inc. to comply with the terms of said Escrow Agreement.

An FMI interoffice memorandum dated July 26, 1972, reflects FMI was aware of the fact that Motor Inn had made preliminary arrangements to lease furniture and equipment from Leasing Service Corpora-

tion. The memo also refers to the requirement of the loan commitment that Motor Inn secure approval from FMI of any secondary financing arrangement. The evidence fails to disclose any details of such "preliminary arrangements." FMI did have a copy of a proposed agreement between Motor Inn and Leasing Service to subordinate the latter's interest in the furniture to FMI's security interest therein. However, this document was never executed. Another FMI interoffice memorandum mentions that Motor Inn was considering a sale to Leasing Service Corporation accompanied by a lease-back to Motor Inn. There is no evidence that FMI ever gave approval to Motor Inn of any financing arrangement with Leasing Service. In fact, the furniture and equipment were purchased from Landmark by Leasing Service and leased to Motor Inn. The lease provided for options to purchase by the lessor at continually decreasing prices on each anniversary date of the lease. The trial court found this to be a "true lease" as opposed to a security interest and that Leasing Service was the owner of the furniture and equipment. On September 11, 1972, Leasing Service filed a UCC Financing Statement with a copy of the lease attached with the St. Charles County Recorder of Deeds.

In the spring of 1974 Motor Inn was in default on its payments to FMI and the latter discovered Leasing Service's claim of ownership of the furniture and equipment when it caused a title search to be made. In February 1976 FMI foreclosed on its deed of trust and security interest and purchased the real property and the furniture and equipment. Subsequently, Leasing Service sued FMI in the State of New York seeking, among other relief, $150,000 actual and $250,000 punitive damages for conversion of the furniture and equipment. On August 17, 1976, FMI called upon Minnesota Title to defend this action under its policy insuring FMI's security interest in the real and personal property in Motor Inn. After first refusing, Minnesota Title eventually assumed the defense of this liti-

gation. After discovery and extensive negotiations and after notifying CESI of its intent to do so, Minnesota Title settled the New York case for a payment of $40,000 in exchange for title to the furniture and equipment. A total of $50,045.49 was expended by Minnesota Title, consisting of the settlement amount, legal fees, and other litigation expenses. Minnesota Title then instituted this action against CESI on July 5, 1978, seeking to recover that sum. The trial court, without a jury, heard evidence, found in favor of Minnesota Title and awarded damages in the amount of $50,045.49 plus interest in the sum of $9,106.51.

On appeal CESI first contends the trial court erred in failing to find that Minnesota Title's action was barred by the five year statute of limitations, § 516.120, RSMo 1978. This five year-period commences not "when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained." § 516.100, RSMo 1978.

It is firmly established in Missouri law that this statute fixes the time at which the statutory period commences at the date on which damages are capable of ascertainment, not the date upon which they are discovered. *Lato v. Concord Homes, Inc.*, 659 S.W.2d 593, 594–95 (Mo. App.1983). Capable of ascertainment refers to the fact of damage rather than the precise amount. *Id.* at 595. The statute begins to run when the plaintiff's right to bring and maintain a suit arises. *Davis v. Laclede Gas Co.*, 603 S.W.2d 554, 555 (Mo. banc 1980).

The trial court held the statute inapplicable because the suit was commenced within two years of August 17, 1976, the date of notification by FMI to Minnesota Title of the claim of Leasing Service. CESI argues that the statute began to run in September, 1972 when the disbursement of the escrowed funds for furniture and equipment was made. The fact we hold the finding of the trial court to be erroneous is of no solace to CESI, for we reject its argument as well.

The cornerstone of Minnesota Title's action, as pleaded in its amended petition, is the letter by CESI to Missouri Title Guaranty Company on October 3, 1972, requesting the issuance of the final policy of title insurance. The notice and affidavit are both composed of printed forms with typewritten insertions. They are clearly intended to convey the assertion by CESI that the project had been completed and fully paid for and that CESI had performed its obligation of disbursing the construction loan funds in accordance with the construction and disbursing escrow agreement. CESI does not contend otherwise, but asseverates only that Minnesota Title had no right to rely upon its representations and, in fact, did not so rely, contentions to be addressed later. Under Minnesota Title's pleaded theory, the wrong was done on October 3, 1972, when CESI made its representations and requested issuance of the final policy. But this does not trigger the period of limitations under § 516.100 unless damages capable of ascertainment had then been sustained.

Minnesota Title sustained no ascertainable damage at the time of the erroneous notice. CESI tacitly recognizes this fact but argues that the basis of this action is the subrogation of Minnesota Title to the rights of its insured, FMI. The argument then notes that FMI sustained damage by reason of the wrongful disbursement which impaired its security, so that for FMI the statute of limitations commenced running in September 1972. As subrogee, the argument continues, Minnesota Title stands in the shoes of FMI, having only the rights of its subrogor and being subject to all the defenses available against the latter. This ingenious contention is bottomed upon a false premise. Although the facts pleaded in the amended petition include allegations which could perhaps give rise to a cause of action for subrogation, the totality of the petition clearly alleges a direct, not a deriv-

ative action. The basis of Minnesota Title's pleaded claim is the representation made by CESI that the construction project had been completed in accordance with the escrow agreement. This representation was made directly to the agent of Minnesota Title, with the knowledge and expectation by CESI that it would be relied upon as the final step in fulfilling the commitment of Minnesota Title to issue its policy to FMI, provided the construction funds were disbursed through CESI.

■ CESI argues that Minnesota Title had no right to rely upon the representation. We disagree. Although not a party to the Construction and Disbursing Escrow Agreement, Minnesota Title was certainly an intimate and essential party to the entire transaction. The liability of those who hold themselves out as professionals or experts to parties not in privity with them for negligent misrepresentations is well established. An excellent and thorough discussion of this principle allowing recovery for negligent performance of contractual obligations to a non-party to the contract whose reliance upon proper performance is known and anticipated is contained in *Westerhold v. Carroll*, 419 S.W.2d 73 (Mo.1967). The following quotation from that opinion is particularly appropriate to the instant case:

> The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to defendant's conduct, and the policy of preventing future harm. *Biakanja v. Irving*, 49 Cal.2d 647, 320 P.2d 16, 65 ALR2d 1358. Each and every one of the above elements are not absolutely necessary to authorize an action to be maintained, but we consider all to be satisfied

in this case except we doubt that any 'moral blame' can be leveled at defendant.

419 S.W.2d at 81.

There can be no question that the involved financial arrangements for the construction project were undertaken to insure the security of FMI's loan. The lender sought protection from CESI in the disbursement of the funds and, from the outset, looked to Minnesota Title for protection from, *inter alia*, errors made in this disbursement. The totality of the financial package including these protections was known to all involved. Under these circumstances, Minnesota Title was entitled to rely upon the representation of CESI that it had performed its obligations in accordance with the provisions of the Escrow Agreement.

■ CESI also argues that Minnesota Title did not issue its policy of insurance in reliance upon the misrepresentation because the policy is dated August 28, 1972, and the representation was not made until October 3, 1972. This argument overlooks the testimony that the policy was not issued until after the receipt of the notice from CESI that the project was completed in accordance with the Escrow Agreement and CESI's own request that the final policy be issued. The commitment to insure FMI was conditioned upon completion of the disbursement of the construction funds by CESI. Such evidence amply supports the finding of the trial court that Minnesota Title did rely upon the representation of CESI in the issuance of the policy, even though the policy date may have preceded its delivery to the insured.

As noted above, Minnesota Title sustained no damage at the time of the improper disbursement or at the time of the erroneous notice from CESI. At most, it was exposed to a possible loss in the future if, but only if, Motor Inn defaulted. In that event FMI would either foreclose on the security interest on the furniture and equipment or it would forego such action, conceding the ownership interest of Leasing Service. If the latter, FMI could recov-

er under the policy whatever loss it may have sustained. If the former, Minnesota Title would be subject to defending the action for conversion and to hold FMI harmless therein because of the agreement to guarantee the disbursements by CESI. But in the absence of a default by Motor Inn, neither of these eventualities would occur and no one would sustain damage by reason of CESI's disbursement or the erroneous notice.

'A claim for relief has accrued when a right exists to institute a suit for its enjoyment.' *State ex rel. Collector of Revenue of City of St. Louis v. Robertson,* 417 S.W.2d 699, 700[1] (Mo.App. 1967); *Boyd v. Buchanan,* 176 Mo.App. 56, 162 S.W. 1075 (1914). Stated somewhat differently, 'the time begins to run under a statute of limitations only after the right to prosecute a claim to a successful conclusion has accrued.... It does not necessarily begin to run when the liability is created.' *Beckers-Behrens-Gist Lumber Company v. Adams,* 311 S.W.2d 70, 74[4] (Mo.App.1958); holding that the statute does not begin to run where there is an unfulfilled condition precedent to the ability to sue. *See also Anderson v. Dyer,* 456 S.W.2d 808, 811[3] (Mo.App.1970); *National Credit Associates, Inc. v. Tinker,* 401 S.W.2d 954, 956[2] (Mo.App.1966). 'Where a party's right depends on the happening of an event in the future, the cause of action accrues, and the statute of limitations begins to run, only at the time when the event happens.... Whether the contingency affects the right or merely the amount of recovery, the rule is the same....' 54 C.J.S. Limitations of Actions § 110a, pp. 14–15; *see also* 51 Am.Jr.2d, Limitations of Actions, § 111, p. 682. Thus the plaintiff's cause of action cannot be said to have accrued until it is within his power to prosecute a suit to a successful judgment.

*De Paul Hospital v. Southwestern Bell Telephone Co.,* 539 S.W.2d 542, 546–47 (Mo.App.1976).

■ In September-October, 1972, Minnesota Title could not have successfully presented any claim against CESI. There was no liability under the policy of insurance because none of the risks insured against had occurred. Any liability of Minnesota Title was contingent upon a future event, a default by Motor Inn. Exhibits introduced in evidence and filed with this court indicate that Motor Inn was first in default in the spring of 1974 and some discussions regarding a restructuring of the loan were undertaken. At this point FMI ordered a title search and discovered the Leasing Service claim of ownership of the furniture and equipment. Whether Motor Inn continued to be in default or fell behind in its payments a second time is not clear from the exhibits, but in the fall of 1975 FMI initiated foreclosure proceedings. In any event, April or May 1974 would have been the earliest date in which Minnesota Title would have been in jeopardy of sustaining any damage by virtue of its policy guarantee that CESI had properly performed its obligations under the escrow agreement. Since that time is within the five-year limitation preceding July 5, 1978, when this action was commenced, we need not further prolong this opinion by addressing the complex question of ascertainability of damages as between the date of commencement of foreclosure, completion thereof, or the filing of the New York lawsuit by Leasing Service.

Next CESI contends the trial court erred in finding that the settlement of the New York lawsuit was reasonable and prudent. This contention is predicated upon the assertion that under New York law the lease of furniture and equipment was not a "true lease", as found by the trial court, but rather a secured installment sale conferring upon Leasing Service only a security interest in the property which was subject to FMI's prior security interest. Section 1–201(37) of the Uniform Commercial Code provides in part as follows:

Whether a lease is intended as security is to be determined by the facts of each case; however, ... an agreement that upon compliance with the terms of the lease the lessee shall become or has the

option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

■ CESI argues that the lease provision giving Motor Inn the option to purchase the furniture and equipment for $20,500 at the conclusion of the lease term was such a nominal sum in comparison to the total rental cost that, as a matter of law, the lease must be found to be one for security and not a true lease. We disagree. In determining what is a "nominal sum" under § 1–201(37) various comparisons are used by the courts: 1) the option price is compared to the fair market value of the property at the time for exercising the option, 2) the option price is compared with the original cost or total rental paid, 3) the option price is such that the lessee has no practical choice but to exercise the option. *See Annot.* 76 A.L.R.3d 11, 19 (1977). The third test is usually found in situations where ownership is transferred to the lessee upon the payment of an obviously nominal sum such as $1.00 at the expiration of the lease term. The first two tests involve factual determinations which are more open to debate. Section 1–201(37) expressly provides for a case-by-case factual determination. An extended discussion of decisions is unnecessary to demonstrate that reasonable minds could reach different conclusions as to the intention of the parties here. Applying the first test, whether a $20,500 payment for furniture and equipment used in a motel catering to transient families is disproportionate to its fair market value after five years is obviously a question subject to differing opinions. Utilizing the second test, a comparison of $20,500.00 to the total cost, $132,395.32, or to the total rental paid, $271,620.00, although not as patently debatable as the first comparison, is nevertheless not completely conclusive of an intent to create a secured installment sale.

■ Because compromise settlements are so favored, courts are understandably reluctant to look behind such dispositions of litigated matters. In the absence of bad faith or collusion, of which there is no contention here, the court will look only so far as to detect a bona fide dispute of even colorable merit in order to uphold the resolution of differences reached by the parties themselves. *Weinberg v. Globe Indemnity Co.*, 355 S.W.2d 341, 346 (Mo.App.1962). *Duncan v. Black*, 324 S.W.2d 483, 486 (Mo. App.1959) comprehensively defines the essential nature of a "doubtful" claim which is subject to binding compromise as follows:

> For one thing, and by all authority, the claim upon which the settlement is based must be one made in good faith. Of that there is no dispute in this case. Secondly, the claim must have *some* foundation. As to this second consideration we find the courts using varying language. The claim cannot be 'utterly baseless.' It has been said that it must have a 'tenable ground' or a 'reasonable tenable ground.' It must be based on a 'colorable right' or on some 'legal foundation.' It must have at least an appearance of right sufficient to raise a 'possible doubt' in favor of the party asserting it. This is the Missouri rule.
>
> It is difficult to reconcile the antinomous rules and statements which are applied to the 'doubtful claims' and to find the words which will exactly draw the line between the compromise (on the one hand) of an honestly disputed claim which has some fair element of doubt and is therefore to be regarded as consideration and (on the other hand) a claim, though honestly made, which is so lacking in substance and virility as to be entirely baseless. The Missouri Courts have struggled and not yet found apt language. We think we had best leave definitions alone, confident that, as applied to each individual case, the facts will make the thing apparent. But if we should make further effort to distinguish we would say that if the claimant, *in good faith*, makes a mountain out of a mole hill the claim is 'doubtful.' But if there is no discernible mole hill in the beginning, then the claim has no substance.

We cannot say the claim of Leasing Service that FMI was guilty of conversion in acquiring the furniture and equipment at foreclosure sale when it had actual knowledge of the claimed ownership thereof by Leasing Service was "utterly baseless" and without "some foundation." The disposition of an exposure to a possible $400,000 judgment for $40,000 which included conveyance of title to the property was neither unreasonable nor imprudent.

■ CESI also challenges the settlement contending Minnesota Title failed to assert a policy defense to avoid liability and any obligation to defend its insured, FMI. This contention is based upon a policy exclusion of adverse claims agreed to by the insured or known to the insured but not shown by public records. CESI points to the knowledge of FMI concerning Motor Inn's intention to enter into a lease arrangement for furniture and equipment. The evidence relating to this issue fails to establish that FMI knew or consented to the actual leasing transaction. At most, FMI was aware of preliminary arrangements which would have maintained the superiority of its security interest. No evidence establishes FMI knew the actual arrangement failed to do so. We defer to the finding of the trial court on this question of fact and conclude that its determination that Minnesota Title was required to defend the New York lawsuit was not against the weight of the evidence.

■ Finally CESI maintains its disbursement of the escrowed funds directly to Motor Inn was authorized by the telegram from FMI requiring as a precondition only that the furniture be "fully paid for." Since the telegram was silent regarding the party by whom payment should be made, CESI argues the trial court erred in finding that payment by the borrower and not an "outside party" was anticipated. When viewed in the light of the complex loan arrangements insisted upon by FMI and agreed to by all parties, which contemplated assurance to FMI that its security would not be impaired, the argument made by CESI appears spurious. To say that proof of payment by any stranger to the agreement was sufficient to authorize disbursement is to ignore the intrinsic purpose of the escrow agreement. The object, nature, and purpose of an agreement must be considered and the court may not look only to the letter of an agreement, disregarding its spirit. *Wilshire Construction Co. v. Union Electric Co.*, 463 S.W.2d 903, 906 (Mo. 1971). This point is without merit.

On Count I the trial court's findings were not against the weight of the evidence and its conclusions did not misstate or misapply the law. Accordingly, the judgment of the trial court on Count I is affirmed. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

## COUNT II.

In Count II of its amended petition Minnesota Title sought reimbursement from CESI for payments made in settlement of mechanics' liens on property in St. Louis County. Berbay Construction Company had arranged for a construction loan from Missouri Savings Association. On March 25, 1976, Minnesota Title issued a commitment to Missouri Savings for title insurance conditioned upon the disbursement of the construction loan by CESI. On April 28, 1976, CESI, Berbay, and Missouri Savings entered into a construction and disbursing escrow agreement whereby CESI guaranteed Missouri Savings against mechanics' liens. On May 7, 1976, Minnesota Title issued a Title Insurance Binder also conditioned upon disbursement of the construction loan funds by CESI. On the same date, Minnesota Title issued its permanent policy insuring Missouri Savings in the amount of the construction loan. The policy insured against mechanics' liens.

May 7, 1976, was also the date of the construction loan and the payment of the loan funds to CESI for disbursement. The executive vice president of Missouri Title, the agent of Minnesota Title, was unable to explain how the permanent title policy was issued before construction was completed and without any final affidavit of completion from the contractor and CESI. .Ap-

proximately one year later, in the spring and early summer of 1977, a number of mechanics' liens were filed against the property.

Berbay Construction defaulted on the construction loan and Missouri Savings instituted foreclosure proceedings. On May 25, 1977, Missouri Savings sold the note and deed of trust to William and Marcia Albrecht who concluded the foreclosure and purchased the property on that same date. The insurance policy afforded coverage to a party acquiring an interest in the land by foreclosure, trustees sale, or conveyance in lieu of foreclosure. The Albrechts called upon Minnesota Title to defend against the mechanics' liens and, after investigation, it settled four of them for a total of $5,076.83. CESI in its answer to the amended petition admitted that Minnesota Title had demanded that CESI dispose of and settle the liens. The trial court found in favor of Minnesota Title and entered judgment against CESI in the amount of $5,076.83 plus interest.

On appeal from the judgment CESI states that its defense to Count II is based upon paragraph thirty-five of the Construction and Disbursing Escrow Agreement:

35. Mortgagee agrees that the full amount of the loans to be disbursed under this agreement shall be disbursed through the Escrowee. In the event Mortgagee makes a permanent loan to a new purchaser, it is agreed that the Escrowee will transfer its guarantee provided that the Mortgagee requires that Contractor to obtain Certification from the Escrowee that all bills have been presented and paid together with an affidavit to this effect signed by the Contractor ... Mortgagee further agrees to give Escrowee written notice within ten (10) days of its receipt of any lien notice or notice of any suit affecting the property under this agreement.

CESI argues that Minnesota Title breached this provision of the escrow agreement in that 1) Minnesota Title disbursed funds in payment of labor and material bills on its own instead of through

CESI, 2) Minnesota Title failed to obtain any certification or affidavit from the contractor or CESI that all labor and material bills had been paid, and 3) Minnesota Title failed to give CESI written notice of the claims. Implicit in CESI's argument is the assumption that Minnesota Title, although not a party to the Escrow Agreement, stands in the shoes of and is subject to all the defenses available against Missouri Savings, the mortgagee and Minnesota Title's named insured. Minnesota Title does not challenge this assumption.

■■■ The contract provision called for the disbursement by CESI of the "full amount of the loans." The record is silent with regard to the disbursement of the loan funds. It is probably safe to assume that they were expended before Berbay defaulted. Whether or not CESI exercised its option to require Berbay to put up additional funds is also undisclosed by the record. However, none of the loan funds were disbursed or paid by Minnesota Title or by any party to the escrow agreement other than CESI. The payment by Minnesota Title to settle the mechanics' liens did not involve the construction loan monies and could not be considered as a breach of this condition.

Nor was there any permanent loan to a new purchaser made by the mortgagee, Missouri Savings. This provision is obviously intended to apply to a situation where the owner-contractor conveys the improved property to a purchaser who finances the purchase through Missouri Savings. In such an event, CESI would seek protection from liability to the new purchaser on account of unpaid bills not presented by the contractor. But that event never took place. Missouri Savings did not make a permanent loan to a new purchaser, rather, it sold the note and deed of trust to the Albrechts who financed their purchase through another lender. Minnesota Title remained liable to the Albrechts who came under the successor-insured provision of the policy. The condition giving rise to this contractual provision never oc-

curred and therefore CESI's reliance thereon is misplaced.

■ Finally, CESI contends that the ten-day written notice requirement is a condition precedent to any liability it may have to the mortgagee or to the mortgagee's insuror. This contention is raised by CESI for the first time on appeal. In its answer to the amended petition it admitted that Minnesota Title made demand upon it to dispose of and settle the mechanics' liens. The testimony relating to such a demand is unrefuted. The record is silent with regard to the time of the demand and whether it was oral or written. However, CESI's refusal to accept responsibility for the liens was predicated upon the fact that the deed of trust had been sold. Its answer alleged that CESI had no obligation to satisfy the mechanics liens' because the liens were rendered null and void by reason of the foreclosure. In the trial court, counsel for CESI argued that the refusal was justified because Minnesota Title had issued its policy without first obtaining an affidavit of completion of the escrow agreement.

No contention was made to the trial court that the demand need not be honored because it was untimely or unwritten. On appeal CESI may not originate a brand new contention for the first time. *Cline v. Graves,* 641 S.W.2d 151, 155 (Mo.App.1982). We will not review a legal proposition not presented to or expressly decided by the trial court. *South Side Plumbing Co. v. Tigges,* 525 S.W.2d 583, 590 (Mo.App.1975).

The judgment of the trial court on Count II is affirmed.

SMITH, J., and JEAN C. HAMILTON, Special Judge, concur.